**DISTRICT OF OREGON**

**F I L E D**

**June 16, 2011**

**Clerk, U.S. Bankruptcy Court**

The findings and conclusions set out in this order are for the purpose of this order only, and subject to review prior to or in conjunction with entry of any final order.

|

FRANK R. ALLEY
U.S. Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF OREGON

| | |
|---|---|
| In re | ) Case No. 11-62723-fra11 |
| | ) |
| Olsen Agricultural Enterprises LLC, | ) Chapter 11 |
| an Oregon limited liability company, | ) |
| | ) INTERIM ORDER (I) |
| Debtor. | ) AUTHORIZING DEBTOR TO |
| | ) OBTAIN POSTPETITION SECURED |
| | ) FINANCING, (II) GRANTING |
| | ) ADEQUATE PROTECTION TO |
| | ) PREPETITION SECURED PARTIES |
| | ) AND (III) SCHEDULING A FINAL |
| | ) HEARING |

Olsen Agricultural Enterprises LLC  (the "Debtor")[1] having filed its motion [Dkt

#34] (the "Motion") for interim and final debtor in possession financing orders

authorizing it to, among other things, (i) incur postpetition secured indebtedness, (ii)

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Preliminary Indicative Term Sheet for Debtor in Possession Credit Loan dated May 27,

grant security interests and superpriority claims, and (iii) grant adequate protection, pursuant to sections 105(a), 362, and 364(c), (d), and (e) of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and having sought the following relief:

(a)     This Court's authorization, pursuant to Bankruptcy Code sections 105(a), 362, and 364(c), (d), and (e) and Bankruptcy Rules 2002, 4001 and 9014, for the Debtor to enter into a debtor in possession credit agreement pursuant to the terms and conditions of the Term Sheet (a copy of which is attached to the Motion as Exhibit A) with Bacchus Capital, L.P. (the "DIP Lender") for a loan (the "DIP Loan") in the aggregate principal amount of $3,000,000 in accordance with the terms and conditions set forth in the DIP Loan Documents.  As used herein, the term "DIP Loan Documents" shall refer collectively to the Term Sheet, the Interim Order and the Final Order (as defined below);

(b)     This Court's authorization to grant to the DIP Lender (i) superpriority administrative expense status pursuant to section 364(c)(1) of the Bankruptcy Code with respect to all obligations of the Debtor under the DIP Loan Documents, the Interim Order and the Final Order (collectively, the "DIP Loan Obligations"), (ii) liens pursuant to Bankruptcy Code sections 364(c)(2) and 364(c)(3), and (iii) priming liens pursuant to section 364(d) of the Bankruptcy Code;

---

2011 (the "Term Sheet").

(c)    This Court's approval, pursuant to Bankruptcy Code sections 361 and 364, of the form and manner of adequate protection set forth herein to be provided to (i) Rabo Agrifinance, Inc. ("Rabo"), (ii) BFS International, LLC ("BFS"), (iii) United States of America, acting by and through the Internal Revenue Service (the "IRS"), (iv) Ledeboer Seed, LLC ("Ledeboer"), (v) Callisons, Inc. d/b/a I.P. Callisons and Sons ("Callisons"), and (vi) West Coast Bank (collectively, the "Existing Secured Creditors" and the respective liens of the Existing Secured Creditors, the "Existing Liens");

(d)    This Court's scheduling of an interim hearing (the "Interim Hearing") pursuant to Bankruptcy Rule 4001(c)(2) to consider the entry of an interim order in the form hereof (this "Interim Order") which, among other things, (i) approves, on an interim basis, the postpetition secured financing to be made pursuant to the DIP Loan Documents, (ii) authorizes the Debtor to execute the DIP Loan Documents and to obtain advances on an interim basis in accordance with the DIP Loan Documents in the aggregate principal amount of $675,000, and (iii) grants adequate protection to the Existing Secured Creditors;

(e)    This Court's scheduling of a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") which, among other things, (i) approves, on a final basis, the DIP Loan Documents, (ii) authorizes, on a final basis, the DIP Loan to be made pursuant to the DIP Loan Documents in the aggregate principal amount of $3,000,000 for the purposes of funding expenditures consistent with the budget attached

hereto as <u>Exhibit A</u> (the "<u>Approved Budget</u>"), subject to the variances permitted herein, and (iii) grants, on a final basis, adequate protection to the Existing Secured Creditors; and

(f)   This Court's finding that notice of the Interim Hearing was sufficient and adequate, and no other or further notice being required.

The Interim Hearing having been held on June 13, 2011; and based upon all of the pleadings filed with this Court, the evidence presented at the Interim Hearing and the entire record herein; and this Court having heard and resolved or overruled all objections to the interim relief requested in the Motion; and this Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtor and its estate; and after due deliberation and consideration, and sufficient cause appearing therefor,

**IT IS HEREBY FOUND:**[2]

A.   <u>Chapter 11 Case</u>.  On June 1, 2011 (the "<u>Petition Date</u>"), the Debtor filed herein a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor is continuing in the management and possession of its business and properties as debtor in possession under sections 1107 and 1108 of the Bankruptcy Code.  The Official Committee of Unsecured Creditors (the "<u>Committee</u>") was appointed by the United

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

States trustee on June 9, 2011.  As of the date hereof, no trustee or examiner has been

requested or appointed in this case.

B.     The Debtor's Prepetition Merger.  The Debtor is the surviving entity of a

merger transaction that was consummated on June 1, 2011.  In the merger transaction,

Olsen Agricultural Company, Inc., an Oregon corporation ("OAC"), Jenks-Olsen Land

Co., an Oregon general partnership ("JOLC"), Olsen Vineyard Company, LLC, an

Oregon limited liability company ("OVC"), and The Olsen Farms Family Limited

Partnership ("OFFLP") were merged with and into the Debtor.  OAC, JOLC, OVC and

OFFLP were co-borrowers under the term loan originally made by AXA Equitable Life

Insurance Company and subsequently purchased by Rabo, and OAC, JOLC and OVC

were co-borrowers under the line of credit loans made by Rabo Agrifinance, Inc.  In

connection with the merger transaction, other related parties that pledged real estate

collateral to support the line of credit loans agreed to contribute such property to the

Debtor in exchange for the right to receive ownership interests in the Debtor.

C.     The Debtor's Business.  The Debtor operates an agricultural enterprise on

approximately 7,762 acres of owned and leased land located in Benton, Linn and Polk

Counties.  Its business is  comprised principally of three divisions:  (a) Olsen Seed

Company, which produces and sells a variety of grass seed and grains on approximately

5,934 acres; (b) Olsen Agriculture, which grows and sells peppermint, nursery stock,

squash, hazelnuts and blueberries on approximately 1,334 acres; and (c) Olsen Family

Vineyards, which grows a variety of grapes on approximately 494 acres and produces and sells quality wines under the "Viridian" label as well as private labels.  As of the date hereof, the Debtor has 45 employees, including management personnel.

      D.   <u>Jurisdiction; Venue</u>.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334 and LR 2100.1.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D).  Venue is proper under 28 U.S.C. § 1408.

      E.   <u>Debtor's Stipulations</u>.  In requesting postpetition financing under the DIP Loan Documents, the Debtor acknowledges, represents, stipulates, and agrees that:

      (i)   in entering into the DIP Loan Documents, and as consideration therefor, the Debtor hereby agrees that until such time as all DIP Loan Obligations are indefeasibly paid in full in cash and the commitments related thereto are terminated in accordance with the terms of the DIP Loan Documents, the Debtor shall not in any way grant, seek to grant, or cause to be granted any lien and/or claim that is senior to or *pari passu* with any of the liens, security interests and claims provided under this Interim Order to the DIP Lender, including, without limitation, by offering a subsequent lender or any other party a superior or *pari passu* lien or claim pursuant to Bankruptcy Code section 364(d), or otherwise, except with respect to the Carve-Out; and

      (ii)   the DIP Lender is not and shall not be deemed to be a control person or insider of the Debtor by virtue of any of the actions taken by such parties in respect of or in connection with the DIP Loan Obligations.

F.    <u>Purpose and Necessity of Financing</u>.  The Debtor requires the financing described in the Motion to fund the necessary and critical ordinary course expenses of maintaining and preserving its business consistent with the terms set forth in the DIP Loan Documents, and for other purposes permitted by the DIP Loan Documents.  If the Debtor does not obtain authorization to borrow under the DIP Loan Documents and the DIP Loan is not approved, the Debtor will suffer immediate and irreparable harm.  The Debtor is unable to obtain adequate unsecured credit allowable as an administrative expense under Bankruptcy Code section 503, or other financing under Bankruptcy Code sections 364(c) or (d), on equal or more favorable terms than those set forth in the DIP Loan Documents based on the totality of the circumstances.  Moreover, loan advances in the amount provided by the DIP Loan Documents are not available to the Debtor without granting the DIP Lender superpriority claims, priming liens, and security interests, pursuant to Bankruptcy Code sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d), as provided in this Interim Order and the DIP Loan Documents.  After considering all alternatives, the Debtor determined, in the exercise of its prudent business judgment, that the DIP Loan provided under the DIP Loan Documents represents the best financing package available to it and is in the best interests of the estate.  The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and adequately protect any non-consenting parties' interests in the Collateral.

G.   ~~Good Faith.  The DIP Loan Documents have been negotiated in good faith and at arms' length by the Debtor and the DIP Lender.  The DIP Loan and/or other financial accommodations made to the Debtor by the DIP Lender pursuant to this Interim Order and/or the DIP Loan Documents shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in Bankruptcy Code section 364(e), and the DIP Lender shall be entitled to all protections afforded thereunder, including, without limitation, the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision thereof is vacated, reversed or modified, on appeal or otherwise.  The terms of the DIP Loan Documents are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.~~

H.   ~~Consideration.  The Debtor will receive and has received fair and reasonable consideration in exchange for access to the DIP Loan and all other financial accommodations provided under the DIP Loan Documents and this Interim Order.~~

I.   Notice.  Sufficient and adequate notice of the Interim Hearing and the entry of this Interim Order have been given in accordance with Bankruptcy Rule 4001, and no other or further notice need be given for entry of this Interim Order.

J.   Immediate Entry of Interim Order.  The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  The Motion and this Interim Order comply with Local Bankruptcy Rule 4001-2.  The permission granted

herein to enter into the DIP Loan Documents and to obtain funds thereunder is necessary to avoid immediate and irreparable harm to the estate.  Entry of this Interim Order is in the best interests of the Debtor's estate as its implementation will provide for payment of the necessary and critical ordinary course expenses of maintaining and preserving the Debtor's business and will further enhance the Debtor's prospects for a successful reorganization.

Based upon the foregoing findings, acknowledgements, and conclusions, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED:**

1.    <u>Disposition</u>.  The Motion is granted on an interim basis, subject to the terms set forth herein, and the terms and provisions of the DIP Loan Documents are approved ~~in all respects.~~  Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled on their merits.  This Interim Order shall be valid, binding on all parties in interest, and fully effective immediately upon entry notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, and 9014.  The terms and provisions of the DIP Loan Documents are approved on an interim basis.

2.    <u>Authorization</u>.  The Debtor is hereby authorized to immediately obtain advances under the DIP Loan, pursuant to the terms of this Interim Order and subject to the terms of the DIP Loan Documents, in the aggregate principal amount of $675,000.  Advances under the DIP Loan Documents shall be used by the Debtor to fund, in

accordance with the DIP Loan Documents, its expenses in accordance with the Approved Budget (and the variances permitted thereto).

3.    <u>Authority to Execute and Deliver Necessary Documents</u>.

(a)    The Debtor is authorized to negotiate, prepare, enter into, and deliver the DIP Loan Documents, in each case including any amendments thereto.  The Debtor is further authorized and directed to negotiate, prepare, enter into and deliver any UCC financing statements, pledge and security agreements, and mortgages or deeds of trust encumbering all of the Collateral (as defined in paragraph 5(a) below) for the purposes of securing all of the DIP Loan Obligations.

(b)    The Debtor is hereby further authorized to (i) perform all of its obligations under the DIP Loan Documents and under such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for therein and in this Interim Order, and (ii) perform all acts required under the DIP Loan Documents and this Interim Order, including, without limitation, the payment of loan fees and the reimbursement of present and future costs and expenses (including, without limitation, the DIP Lender's attorneys' and other advisors' fees and expenses), paid or incurred by the DIP Lender as provided for in the DIP Loan Documents.  All such unpaid fees, costs, and other expenses shall be included and constitute part of the principal amount of the DIP Loan Obligations and be secured by the Collateral as provided in the DIP Loan Documents and this Interim Order.  Nothing contained in this

Interim Order shall confer or grant administrative expense status to the Break-Up Fee (as defined in the Term Sheet); provided, however, that nothing shall preclude or prejudice the DIP Lender from seeking administrative expense status for the Break-Up Fee by separate motion at a later date.

(c)     All DIP Loan Obligations shall constitute valid and binding obligations of the Debtor, enforceable against it and its successors and assigns (including, without limitation, any trustee or other estate representative in this Chapter 11 case or in any superseding Chapter 7 case), in accordance with the terms of the DIP Loan Documents and the terms of this Interim Order, and no obligation, payment, transfer or grant of security under the DIP Loan Documents or this Interim Order shall be voidable or recoverable under the Bankruptcy Code or under any other applicable law or subject to any avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), or any other challenges under the Bankruptcy Code or any other applicable law or regulation by any person or entity.

4.     <u>DIP Lender's Superpriority Claim</u>.  The DIP Lender is hereby granted an allowed superpriority administrative expense claim (the "<u>Superpriority Claim</u>") pursuant to Bankruptcy Code section 364(c)(1) for all DIP Loan Obligations, having priority over any and all other administrative expense claims, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under Bankruptcy Code sections 503(b), 507(b), or

otherwise, subject and subordinate in priority of payment only to the payment of the

Carve-Out.  Except as set forth herein, no other superpriority administrative expense

claims under Bankruptcy Code section 364(c)(1) shall be granted or allowed in this

Chapter 11 case.

     5.    <u>DIP Liens</u>.

     (a)    The DIP Loan Obligations shall be secured by:

     (i)    valid, properly perfected, first priority senior liens on all now

existing and hereafter acquired (whether before or after the Petition Date) property of the

Debtor of any nature whatsoever, real and personal, tangible and intangible, including,

without limitation, accounts receivable, general intangibles, payment intangibles,

supporting obligations, investment property, development orders, environmental permits

or other approvals to develop any real property, machinery, equipment, subsidiary capital

stock, chattel paper, documents, instruments, deposit accounts, contract rights, tax

refunds, and all rights, claims, and other causes of action of the Debtor and the Debtor's

estate (including any actions asserted by the Debtor or any subsequently appointed trustee

or representative of the Debtor's estate under any section of the Bankruptcy Code, and in

each case, all proceeds resulting therefrom, excluding, however, avoidance actions under

sections 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code (collectively,

the "<u>Collateral</u>"), pursuant to section 364(d)(1) of the Bankruptcy Code, with such liens

securing the DIP Loan Obligations to prime and be senior in priority to all existing

security interests in and liens on the Collateral other than (A) statutory liens that secure

claims of governmental units for ad valorem property taxes or similar impositions, and

(B) validly perfected purchase money security interests in equipment extant as of the

Petition Date (collectively, the "Non-Primed Liens"); provided, however, if it is

determined that the Debtor has an interest in any commercial tort claims or tax refunds

that are property of the Debtor's estate, the proceeds of such interests shall be part of the

Collateral;

(ii)    perfected, first-priority senior liens, pursuant to section

364(c)(2) of the Bankruptcy Code, on that portion of the Collateral that is unencumbered

property of the Debtor; and

(iii)    perfected, second-priority liens, pursuant to Bankruptcy Code

section 364(c)(3), on that portion of the Collateral subject to any Non-Primed Liens.

(b)    In each case, the Collateral shall also include any and all rents,

issues, products, offspring and profits generated by any item of Collateral, without the

necessity of any further action or any kind or nature by the DIP Lender in order to claim

or perfect such interests.

(c)    The DIP Liens shall not at any time be (i) made subject or

subordinate to, or made *pari passu* with, any other lien, security interest or claim existing

as of the Petition Date, or created under Bankruptcy Code section 364(d) or otherwise,

other than the Non-Primed Liens, or (ii) subject to any lien or security interest that is

avoided and preserved for the benefit of the Debtor's estate under Bankruptcy Code section 551.

(d)    The DIP Liens, Superpriority Claim, and other rights and remedies granted under this Interim Order to the DIP Lender shall continue in this Chapter 11 case and in any superseding Chapter 7 case, and such liens and security interests shall maintain their priority as provided in this Interim Order until all the DIP Loan Obligations have been indefeasibly paid in full in cash and completely satisfied and the DIP Lender's commitments have been terminated in accordance with the DIP Loan Documents.

6.    <u>Fees</u>.  The Debtor is hereby authorized to pay all such interest, fees, costs, and expenses in accordance with the terms of the DIP Loan Documents and this Interim Order, without the DIP Lender or its counsel having to file any further application with this Court for approval or payment of such fees, costs or expenses; provided, however, that the DIP Lender shall furnish summary documentation (which may be redacted in part) of the same to the United States trustee and the Committee upon written request. For the avoidance of doubt, such fees include the Commitment Fee (as described, earned and paid in accordance with the Term Sheet) and an exit fee equal two percent (2%) of the maximum principal amount of the DIP Loan, which exit fee shall be fully earned and due and payable upon the Maturity Date.

7.    <u>Amendments, Consents, Waivers, and Modifications</u>.  The Debtor and the

DIP Lender may enter into any non-material amendments, consents, waivers or modifications to the DIP Loan Documents, including amendments to the Approved Budget, in each case without the need for further notice and hearing or any order of this Court; provided, however, that no such amendment or waiver shall increase the amount of the DIP Lender's lending commitment.

8.    <u>Term</u>.  All DIP Loan Obligations shall be due and payable, and repaid in full, in cash, on the date (the "<u>Maturity Date</u>") that is the first to occur of: (i) February 15, 2012; (ii) the effective date of a plan of reorganization confirmed in this Chapter 11 case; (iii) conversion or dismissal of this Chapter 11 case; (iv) appointment of a trustee in this Chapter 11 case; or (v) the occurrence of an Event of Default under and as defined in the DIP Loan Documents.

9.    <u>Interest on DIP Loan Obligations</u>.  Interest on the DIP Loan Obligations shall accrue at twelve percent (12%) per annum compounding daily and shall be payable monthly in arrears.  The default rate of interest will be four percent (4%) higher than the rate otherwise payable.

10.    <u>Adequate Protection for Existing Secured Creditors</u>.  The Existing Secured Creditors have not consented to the incurrence of the DIP Loan Obligations by the Debtor under the DIP Loan Documents and the Debtor's granting of priming liens in connection therewith.  The Debtor acknowledges and stipulates that the Existing Secured Creditors are entitled, pursuant to Bankruptcy Code sections 361 and 364(d)(1), to adequate

protection of their respective interests in the Debtor's prepetition property (the "Prepetition Collateral") in exchange for the priming of their respective security interests in and liens on the Prepetition Collateral by the DIP Liens being granted to the DIP Lender pursuant to the DIP Loan Documents and this Interim Order.  As adequate protection, the Existing Secured Creditors are hereby granted the protections described in clauses (a) and (b) below:

(a)    Adequate Protection Liens.  Pursuant to Bankruptcy Code sections 361 and 364(d), as adequate protection of the respective interests of the Existing Secured Creditors in the Prepetition Collateral against any diminution in the value of their interests in the Prepetition Collateral resulting from the grant of the DIP Liens, each of the Existing Secured Creditors is hereby granted a continuing valid, binding, enforceable and perfected postpetition lien on the Collateral (the "Adequate Protection Liens").  The Adequate Protection Liens shall be junior in priority only to (i) the DIP Liens, (ii) the Replacement Liens granted under the Interim Order Authorizing Debtor to Use Cash Collateral entered herein on June 3, 2011, as Document #23 (the "Interim Cash Collateral Order") and under any subsequent cash collateral orders, and (iii) all validly perfected and enforceable security interests and liens on the Collateral extant as of the Petition Date; and shall have the same validity, enforceability and relative priorities as the Existing Liens.

(b)    Adequate Protection Claims.  As further adequate protection of the

respective interests of the Existing Secured Creditors in the Prepetition Collateral against any diminution in the value of their interests in the Prepetition Collateral resulting from the grant of the DIP Liens, each of the Existing Secured Creditors shall have an administrative expense claim under Bankruptcy Code section 503(b) that will have superpriority as provided in Bankruptcy Code section 507(b) (the "Adequate Protection Claims").  The Adequate Protection Claims shall be junior in priority to (i) the DIP Lender's Superpriority Claim, and (ii) the superpriority administrative expense claims awarded to the Existing Secured Creditors under the Interim Cash Collateral Order and under any subsequent cash collateral orders.

11.    Carve-Out.

(a)    Notwithstanding anything to the contrary in the Approved Budget or otherwise, prior to the occurrence of an Event of Default, the allowed fees and expenses incurred by estate professionals that may be paid prior to the occurrence of an Event of Default shall be subject to an aggregate cap of $600,000.  Upon the occurrence and during the continuance of an Event of Default with respect to which the DIP Lender provides written notice to the Debtor of the cessation of funding under the DIP Loan Documents (the "Carve-Out Trigger Notice"), to the extent unencumbered funds are not available to pay allowed administrative expenses in full, the DIP Liens, the Superpriority Claim, the Adequate Protection Claims and the Adequate Protection Liens shall be subject to the payment of the "Carve-Out," which shall mean (i) an amount not to exceed

$300,000 on account of all allowed professional fees and expenses incurred by the estate professionals prior to delivery of the Carve-Out Trigger Notice, but which fees and expenses shall not exceed the amounts set forth in the Approved Budget for such items through the date of such notice less any amounts actually paid to or on account of such professionals with respect to such period of time; plus (ii) $50,000 for the payment of allowed professional fees and expenses (including those of a Chapter 7 trustee and its professionals) incurred by the estate arising after delivery of the Carve-Out Trigger Notice; plus (iii) fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and fees payable to the clerk of the Bankruptcy Court, to the extent such fees were incurred prior to delivery of the Carve-Out Trigger Notice.  All amounts payable as part of the Carve-Out shall only be paid to the extent subsequently allowed by order of this Court.

(b)     The DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any professionals incurred in connection with this Chapter 11 case or any superseding Chapter 7 case.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to or reimburse expenses of any professional in this case, or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement, except to the extent of the Carve-Out.

(c)     No liens, claims, interests or priority status, other than the Carve-Out, having a lien or administrative priority superior to *pari passu* with that of the DIP

Liens or the Superpriority Claim granted by this Interim Order, shall be granted while any portion of the DIP Loan Obligations remain outstanding, or any commitment under the DIP Loan Documents remains in effect, without the prior written consent of the DIP Lender.

(d)      Effective upon entry of this Interim Order, during the period between entry of this Interim Order and entry of the Final Order, no party shall be entitled, directly or indirectly, to (i) charge the Carve-Out or the Collateral, whether by operation of Bankruptcy Code sections 105, 506(c) or 552(b) or otherwise, or (ii) direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of Collateral after an Event of Default under the DIP Loan Documents, or termination or breach under the DIP Loan Documents. Effective upon entry of the Final Order, no party shall be entitled, directly or indirectly, to (i) charge the Carve-Out or the Collateral, whether by operation of Bankruptcy Code sections 105, 506(c) or 552(b) or otherwise, or (ii) direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of Collateral after an Event of Default under the DIP Loan Documents, or termination or breach under the DIP Loan Documents.

12.    <u>Release</u>.  Upon entry of the Final Order, the Debtor, on behalf of itself and its estate (including any successor trustee or other estate representative in the Bankruptcy Case or Successor Case), forever and irrevocably (i) releases, discharges, and acquits the

DIP Lender, and each of its respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation and entry into the DIP Loan Documents, and (ii) waives any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and nonavoidability of the DIP Liens and Superpriority Claim.

13.    <u>Limitation on Additional Surcharges</u>.  No action, inaction or acquiescence by the DIP Lender, including funding the Debtor's ongoing operations under this Interim Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Lender to a charge against the Collateral pursuant to Bankruptcy Code sections 506(c), 552(b) or 105(a), and as provided in paragraph 11(d) above, no such costs, fees or expenses shall be so charged against the Collateral without the prior written consent of the DIP Lender, to the extent of its interests in such Collateral. ~~The DIP Lender shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.~~

14.     <u>Additional Perfection Measures</u>.

(a)     The DIP Liens and the Adequate Protection Liens shall be perfected by operation of law immediately upon entry of this Interim Order.  None of the Debtor, the DIP Lender, or the Existing Secured Creditors shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction, or obtain consents from any licensor or similarly situated party in interest, or take any other action in order to validate and to perfect the DIP Liens or the Adequate Protection Liens.

(b)     ~~The DIP Lender and the Existing Secured Creditors may, but shall not be obligated to, obtain consents from any landlord, licensor or other party in interest, file mortgages, financing statements, notices of lien or similar instruments, or otherwise record or perfect such security interests and liens, in which case:~~

(i)     ~~all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and~~

(ii)     ~~no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.~~

(c)     In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Lender and Existing Secured Creditors may, but shall not be obligated to, file a true and complete copy of this

Interim Order in any place at which any such instruments would or could be filed, together with a description of Collateral or Prepetition Collateral, as applicable, and such filings by the DIP Lender and the Existing Secured Creditors shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

15.    <u>Events of Default</u>.  The occurrence of any of the following shall constitute an Event of Default under this Interim Order upon five (5) business days' written notice to the Debtor by the DIP Lender:

(a)    the failure to pay the DIP Loan Obligations in cash in full upon the Maturity Date, or when due if prior to the Maturity Date;

(b)    breach by the Debtor of any of its representations, warranties or covenants under the DIP Loan Documents, which breach is not cured within ten (10) business days of written notice by the DIP Lender to the Debtor of such breach and written notice shall also be provided to the U.S. Trustee and the Committee;

(c)    the filing of a plan of reorganization for the Debtor that (i) is not acceptable to the DIP Lender in its sole and absolute discretion, or (ii) does not provide for the payment in cash in full of the DIP Loan Obligations;

(d)    entry of an order to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Bankruptcy Code

section 506(c);

       (e)    the occurrence of a Material Adverse Effect as that term is defined in the DIP Loan Agreement; or

       (f)    the commencement of litigation which, if successful, would have a material adverse impact on the Debtor's ability to repay the DIP Loan Obligations.

       16.    <u>Consequences of Events of Default; Automatic Stay Vacated and Modified</u>.

       (a)    Upon the occurrence of an Event of Default, (x) the automatic stay of Bankruptcy Code section 362 is hereby ~~vacated and~~ modified to the extent necessary to permit the DIP Lender to immediately (A) deliver a notice of an Event of Default, and (B) terminate or suspend any outstanding advances or use thereof, and (y) after five (5) business days' written notice from the DIP Lender to the Debtor and the Committee of an Event of Default (within which period the Debtor may only dispute the DIP Lender's declaration of an Event of Default on the basis of the events described in paragraph 15(b), 15(e) and 15(f) above in the Bankruptcy Court on an expedited basis), the automatic stay shall terminate, without further order of the Court and without the need for filing any motion for relief from the automatic stay or any other pleading, for the limited purpose of permitting the DIP Lender to do any one or more of the following:  (A) charge the default rate of interest on the DIP Loan Obligations, and (B) declare the principal of and accrued interest, fees and expenses constituting the DIP Loan Obligations to be due and payable. Upon and after the occurrence of an Event of Default, except as provided in the preceding

sentence, the DIP Lender shall be required to file a motion seeking relief from the automatic stay (a "Stay Motion") to enforce any of its other rights or remedies, which motion shall be heard on no more than five (5) days' notice and the only issue to be adjudicated on the Stay Motion shall be whether an Event of Default occurred under the DIP Loan Documents.  The Debtor is deemed to waive any right under Bankruptcy Code section 105 to enjoin the exercise of the rights and remedies by the DIP Lender following an Event of Default.

(b)    Prior to the occurrence of an Event of Default, the Debtor shall have the right to use the Collateral as cash collateral (as that term is defined in Bankruptcy Code section 363(a)) in accordance with the Approved Budget and the Interim Order and the Final Order.  Upon the occurrence and during the continuance of an Event of Default, the Debtor's right to use the Collateral as cash collateral shall terminate automatically and without any further notice from the DIP Lender.

(c)    The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under the DIP Loan Documents or otherwise.  The Debtor shall cooperate fully with the DIP Lender in its exercise of rights and remedies, whether against the Collateral or otherwise.

(d)    This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating

to the application, re-imposition or continuance of the automatic stay of Bankruptcy Code section 362(a) or other injunctive relief requested.

17. <u>Loan Advances, Budget and Reporting</u>.

(a) Proceeds from the DIP Loan shall be used exclusively for funding the expenses (collectively, the "<u>Approved Expenses</u>") which are set forth in the Approved Budget. The Debtor may make expenditures in excess of the amounts set forth in the Approved Budget so long as the total variance does not exceed, on a line-item basis, 10 percent of the total budgeted expenses (exclusive of legal or professional fees and expenses) through the end of the applicable period, and shall be permitted to carry forward from a prior four-week period to the next two succeeding four-week periods any unused portion of the actual amounts attributable to the prior four-week period on a line-item basis. For the avoidance of doubt, no portion of the DIP Loan, the Collateral securing the DIP Loan, the proceeds of the DIP Loan or the Carve-Out may be used in connection with discovery proceedings, initiation or prosecution of any claims, causes of action, objection or other litigation against the DIP Lender or with respect to the DIP Loan Obligations.

(b) On each Friday of every week, beginning June 24, 2011, the Debtor shall deliver: (i) a variance report detailing (x) the cash expenditures for the prior week and a comparison to the Approved Budget for that week, (y) the cumulative cash expenditures for all of the prior weeks since the Petition Date and as compared to the

Approved Budget for such weeks, and (z) a narrative explanation of the variances

between the actual weekly expenditures and the budgeted weekly expenditures; and (ii)

an updated weekly cash flow forecast for the then remaining period of the Approved

Budget (the "Updated Budget"), consistent with the Approved Budget (collectively, the

"Weekly Reports").  The Weekly Reports shall be in form and substance satisfactory to

the DIP Lender.  Subject to the approval of the DIP Lender, which shall not be

unreasonably withheld and which shall not require any further Bankruptcy Court

approval, the Updated Budget shall be deemed the Approved Budget.  Compliance with

the Approved Budget shall be measured on a weekly basis.

      (c)    The Debtor shall additionally provide to the DIP Lender the

following reports and information:

      (i)    monthly financial statements, operating reports, and budget

and operating plans for each such monthly period (the "Monthly Reports"); and

      (ii)    on an as-requested basis all such other reports and

information respecting the Debtor' business, financial condition or prospects as the DIP

Lender from time to time reasonably requests.

      (d)    The delivery of the Weekly Reports and the Monthly Reports shall

be accompanied by a certification from the Debtor that such Weekly Reports and

Monthly Reports are true and correct in all material respects.

      18.    Access.  The DIP Lender and its respective agents and advisors shall have

full access, upon reasonable notice during normal business hours, to the Debtor' business records, business premises, and to the Collateral to enable the DIP Lender or its agents and advisors to (a) review, appraise, and evaluate the physical condition of the Collateral, (b) inspect and review the financial records and all other records of the Debtor concerning the operation of the Debtor's business and the Collateral, and (c) evaluate the Debtor's overall financial condition and all other records relating to the operations of the Debtor and the Collateral.  The Debtor shall fully cooperate with the DIP Lender regarding such reviews, evaluations, and inspections, and shall make their employees and professionals available to the DIP Lender and its professionals and consultants to conduct such reviews, evaluations, and inspections.

19.    <u>Insurance Policies</u>.  Upon entry of this Interim Order, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtor which in any way relates to the Collateral.  The Debtor is authorized and directed to take any actions necessary to have the DIP Lender be added as an additional insured and loss payee on each insurance policy.

20.    <u>Indemnification</u>.  The Debtor shall indemnify and hold harmless the DIP Lender, its affiliates and each of the respective officers, directors, members, partners, employees, agents, advisors, attorneys and representatives of each (each, an "<u>Indemnified Party</u>") from and against any and all claims, damages, losses, liabilities and expenses

(including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the DIP Loan, the Interim Order, the Final Order, or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Loan, except to the extent such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceedings to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Debtor, any of its managers, equity owners or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated by the DIP Loan Documents are consummated.  The Debtor further agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtor or any of its equity owners or creditors for or in connection with the transactions contemplated by the DIP Loan Documents, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings)) determined in a final

judgment by a court of competent jurisdiction to have resulted from such Indemnified

Party's gross negligence or willful misconduct.

21.    <u>Successors and Assigns</u>.  The DIP Loan Documents and the provisions of

this Interim Order shall be binding upon the Debtor, the DIP Lender, the Existing

Secured Creditors, and each of their respective successors and assigns, and shall inure to

the benefit of the Debtor, the DIP Lender, the Existing Secured Creditors and each of

their respective successors and assigns, including, without limitation, any trustee,

responsible officer, estate administrator or representative, or similar person appointed in a

case for the Debtor under any chapter of the Bankruptcy Code.  Upon entry of the Final

Order, the provisions of the DIP Loan Documents, the Interim Order and the Final Order

shall also be binding on all of the Debtor's creditors, equity owners, and all other parties

in interest.

22.    <u>Binding Nature of Agreement</u>.  Each of the DIP Loan Documents to which

the Debtor is or will become a party shall constitute legal, valid, and binding obligations

of the Debtor, enforceable in accordance with their terms.  The DIP Loan Documents

have been or will be properly executed and delivered to the DIP Lender by the Debtor as

soon as is practicable after entry of this Interim Order.  The rights, remedies, powers,

privileges, liens, and priorities of the DIP Lender provided for in this Interim Order and

in the DIP Loan Documents shall not be modified, altered or impaired in any manner by

any subsequent order (including a confirmation order), by any plan in this Chapter 11

case, or by the dismissal or conversion of this Chapter 11 case or any superseding

Chapter 7 case unless and until the DIP Loan Obligations have first been indefeasibly

paid in full in cash and completely satisfied and the commitments terminated in

accordance with the DIP Loan Documents.

   23. <u>Subsequent Reversal or Modification</u>. This Interim Order is entered

pursuant to Bankruptcy Code section 364, and Bankruptcy Rule 4001(c), granting the

DIP Lender all protections afforded by Bankruptcy Code section 364(e). If any or all of

the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed,

that action will not affect (i) the validity of any obligation, indebtedness or liability

incurred hereunder by the Debtor to the DIP Lender, prior to the date of receipt by the

DIP Lender of written notice of the effective date of such action, or (ii) the validity and

enforceability of any lien or priority authorized or created under this Interim Order or

pursuant to the DIP Loan Documents. Notwithstanding any such reversal, stay,

modification or vacatur, any postpetition indebtedness, obligation or liability incurred by

the Debtor to the DIP Lender prior to written notice to the DIP Lender of the effective

date of such action shall be governed in all respects by the original provisions of this

Interim Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges,

and benefits granted herein and in the DIP Loan Documents with respect to all such

indebtedness, obligations or liability.

   24. <u>Restriction on Use of DIP Lender's Funds</u>. The Superpriority Claim, the

Page 30 of 35  -  INTERIM ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION SECURED
FINANCING, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED
PARTIES AND (III) SCHEDULING A FINAL HEARING \7095\p Interim Order Finance.DOC

DIP Liens, the Adequate Protection Claims and the Adequate Protection Liens shall be valid and binding liens and claims, enforceable in accordance with the provisions hereof, and no proceeds from the DIP Loan, Collateral or proceeds thereof, or any portion of the Carve-Out may be used to pay any claims for services rendered by any of the professionals retained by the Debtor (or any successor trustee or other estate representative in this Chapter 11 case or in any superseding Chapter 7 case), any creditor or party in interest, any Committee or any other party to ~~(a) request authorization to obtain postpetition loans or other financial accommodations pursuant to Bankruptcy Code section 364(c) or (d), or otherwise, other than from the DIP Lender; and/or~~ (b) investigate, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, the DIP Lender or any of its respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to ~~any transaction, occurrence, omission, or action, including, without limitation,~~ (i) any action with respect to the validity, amount and/or extent of the DIP Loan Obligations or the validity, extent, and priority of the DIP Liens; (ii) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens; and/or (iii) any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) the DIP Lender's assertion, enforcement or realization on the Collateral in

accordance with the DIP Loan Documents or this Interim Order.

25.    <u>Priming and Subordination of Liens</u>.  For avoidance of doubt, and notwithstanding anything to the contrary herein, all liens on the Collateral in existence on the date hereof (except the Non-Primed Liens) shall be primed by the DIP Liens and the Adequate Protection Liens and shall be subordinate to the DIP Liens and the Adequate Protection Liens.

26.    <u>No Waiver</u>.  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender may have to bring or be heard on any matter brought before this Court.

27.    <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights thereunder, or otherwise of the DIP Lender.

28.    <u>Limits on DIP Lender's Liability</u>.  Nothing in this Interim Order or in any of the DIP Loan Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from any and all activities by the Debtor in the operation of its business or in connection with its restructuring efforts.

29.    <u>Priority of Terms</u>.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, any other

order of this Court, or any other agreements, on the one hand, and (b) the terms and

provisions of this Interim Order, on the other hand, unless such term or provision herein

is phrased in terms of "as defined in" or "as more fully described in" the DIP Loan

Documents, the terms and provisions of this Interim Order shall govern.

30.    <u>No Third Party Beneficiary</u>.  Except as expressly set forth herein, no rights

are created hereunder for the benefit of any third party, any creditor or any direct, indirect

or incidental beneficiary.

31.    <u>Survival</u>.  Except as otherwise provided herein, (a) the protections afforded

to the DIP Lender and the Existing Secured Creditors under this Interim Order, and any

actions taken pursuant thereto, shall survive the entry of an order (i) dismissing this

Chapter 11 case, or (ii) converting this Chapter 11 case to a case under Chapter 7, and

(b) the DIP Liens, the Adequate Protection Liens, the Superpriority Claim, and the

Adequate Protection Claims shall continue in this Chapter 11 case, in any superseding

Chapter 7 case or after any such dismissal.  Except as otherwise provided herein, the DIP

Liens and the Adequate Protection Liens shall maintain their priorities as provided in this

Interim Order and in the Final Order, and shall not be modified, altered or impaired in

any way by any other financing, extension of credit, incurrence of indebtedness (except

with respect to any additional financing to be provided by the DIP Lender in accordance

with the Final Order), or any conversion of this Chapter 11 case to a case under Chapter 7

or dismissal of the Chapter 11 case, or by any other act or omission until all DIP Loan

Obligations are indefeasibly paid in full in cash and completely satisfied, and the

commitments under the DIP Loan Documents are terminated in accordance therewith.

32. Final Hearing Date. The Final Hearing shall be held in Courtroom #6 on

July 13, 2011, commencing at 10:00 a.m., at the Wayne L. Morse Courthouse, 405 E. 8th

Avenue, Eugene, OR.

33. Proof of Claim. The DIP Lender is hereby relieved of the requirement to

file a proof of claim with respect to any DIP Loan Obligations and any other claims or

liens granted hereunder or created hereby.

34. Entry of Interim Order; Effect. This Interim Order shall take effect

immediately upon execution hereof, notwithstanding the possible application of

Bankruptcy Rules 6004(h), 7062, 9014, or otherwise.

35. Retention of Jurisdiction. This Court shall retain jurisdiction over all

matters pertaining to the implementation, interpretation and enforcement of this Interim

Order and/or the DIP Loan Documents.

/ / /

/ / /

36.    <u>Binding Effect of Interim Order</u>.  The terms of this Interim Order shall be binding on any trustee appointed under Chapter 7 or Chapter 11 in this case.

# # #

Presented by:

        /s/  David A. Foraker
David A. Foraker, OSB #812280
Greene & Markley, P.C.
1515 SW Fifth Avenue, Suite 600
Portland, OR  97201
Telephone:  (503) 295-2668
Facsimile:    (503) 224-8434
E-mail: david.foraker@greenemarkley.com
Attorneys for Debtor

cc:    List of Interested Parties

Exibit A - Approved Budget

CONFIDENTIAL
Page 1 of 4
6/14/2011 5:46 PM

**Weekly Budget for Olsen Agriculture LLC**

| | Week beginning | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 30-May-11 | 6-Jun-11 | 13-Jun-11 | 20-Jun-11 | 27-Jun-11 | 4-Jul-11 | 11-Jul-11 | 18-Jul-11 | 25-Jul-11 | 1-Aug-11 | 8-Aug-11 | 15-Aug-11 | 22-Aug-11 | 29-Aug-11 | 5-Sep-11 | 12-Sep-11 |
| **Receipts:** | | | | | | | | | | | | | | | | | |
| 200 | Seed | 114,000 | 48,000 | 48,000 | 48,000 | - | 40,000 | 40,000 | 40,000 | 40,000 | 68,000 | 68,000 | 68,000 | 68,000 | 68,000 | 68,000 | 68,000 |
| 400 | Mint (net) | - | - | - | - | - | - | - | - | - | - | - | - | 60,000 | 100,000 | 100,000 | 100,000 |
| 500 | Row Crops | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 600 | Fuel (Delivery) | - | - | - | - | - | - | - | - | - | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 6,000 | 6,000 |
| 700 | Nut | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 9,000 |
| 900 | Wine & Grapes | - | - | 3,000 | - | - | - | 3,000 | - | - | - | 3,000 | - | - | - | - | 3,000 |
| | Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | **Total Receipts** | 130,000 | 64,000 | 67,000 | 64,000 | 71,000 | 56,000 | 55,000 | 52,000 | 52,000 | 91,000 | 94,000 | 91,000 | 151,000 | 186,000 | 186,000 | 166,000 |
| **Disbursements** | | | | | | | | | | | | | | | | | |
| | Brokerage Fees | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 |
| | Rent (Land Leases) | - | 50,000 | 50,000 | 175,000 | 45,250 | - | 123,250 | - | 131,000 | - | 110,000 | 110,000 | 110,000 | - | - | - |
| | Chemicals & Fertilizer | 6,400 | 6,400 | 6,400 | 6,400 | 18,000 | 18,000 | 18,000 | 20,000 | 20,000 | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 |
| | Fuel, Oil & Nat. Gas | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 |
| | Misc Production costs | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 4,000 | 4,000 | 3,000 | 3,000 |
| | Property Taxes - Current | - | 25,000 | 25,000 | 25,000 | - | - | - | - | - | - | - | - | - | - | - | - |
| | Utilities | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 4,000 | 4,000 | 3,000 | 3,000 |
| | Repairs & Maintenance | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 |
| | Misc. Maint. Supplies | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| | Shipping & Handling | 15,570 | 2,200 | 7,000 | - | 85,250 | - | 10,000 | 10,000 | 10,000 | - | 10,000 | - | 16,000 | 10,000 | 50,000 | 10,000 |
| | Wine Processing and Bottling | 1,678 | 8,278 | 76,250 | 9,378 | 9,378 | - | 133,250 | - | 131,000 | 14,410 | 12,100 | 12,100 | - | - | 75,000 | - |
| | Payroll | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 8,250 | - |
| | Payroll tax 18 portion | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | Sales & Marketing Expense | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 |
| | Admin Expenses | 2,896 | 2,896 | - | - | - | 2,896 | - | 2,896 | - | 2,896 | - | 2,896 | - | - | 2,896 | - |
| | Insurance | - | - | - | 9,910 | - | - | - | - | 9,910 | - | - | - | 9,910 | - | - | - |
| | Equipment Leases | - | 2,730 | 5,000 | 7,000 | 7,200 | 2,730 | 5,000 | 7,000 | 7,200 | 2,730 | 2,730 | 2,995 | 7,000 | 7,200 | 2,730 | 330 |
| | Contingency | 3,150 | 4,805 | 5,075 | 6,385 | 9,195 | 5,693 | 8,834 | 5,093 | 10,994 | 9,175 | 9,175 | 2,995 | 8,884 | 8,884 | 6,327 | 1,883 |
| | **Total Disbursements** | 32,796 | 100,898 | 190,946 | 215,437 | 134,081 | 92,038 | 385,510 | 64,962 | 280,683 | 75,242 | 192,673 | 62,603 | 186,562 | 44,162 | 113,671 | 39,552 |
| | **Cash Flow from Operations** | 97,244 | (36,898) | (123,986) | (151,437) | (63,081) | 23,962 | (330,510) | (12,962) | (174,849) | 15,858 | (98,673) | 29,398 | (35,562) | 137,838 | 53,129 | 146,648 |
| | **Accumulated Cash Flow** | 97,244 | 60,346 | (65,640) | (217,077) | (280,157) | (256,176) | (386,685) | (399,647) | (574,536) | (562,072) | (661,345) | (631,947) | (662,599) | (529,625) | (476,541) | (330,093) |
| | **Lowest Account Cash Value** | | | | | | | | | | | | | | | | |

(662,509)    22-Aug-11

Disclaimer: This presentation estimates performance of the Company based on historical data, estimates, and assumptions. It cannot be relied upon to reflect actual results.

CONFIDENTIAL
4/14/2011 5:46 PM
Page 2 of 4

## Weekly Budget for Citrus Agriculture LLC

| Week beginning | 1 30-May-11 | 2 6-Jun-11 | 3 13-Jun-11 | 4 20-Jun-11 | 5 27-Jun-11 | 6 4-Jul-11 | 7 11-Jul-11 | 8 18-Jul-11 | 9 25-Jul-11 | 10 1-Aug-11 | 11 8-Aug-11 | 12 15-Aug-11 | 13 22-Aug-11 | 14 29-Aug-11 | 15 5-Sep-11 | 16 12-Sep-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Non Operating Items** | | | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | | | |
| DIP Financing | - | - | 675,000 | - | - | - | - | 2,375,000 | - | - | - | - | - | - | - | - |
| Equipment Sales | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Land Sales | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Receipts | - | - | 675,000 | - | - | - | - | 2,375,000 | - | - | - | - | - | - | - | - |
| **Disbursements** | | | | | | | | | | | | | | | | |
| Rabo Note | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Rabo Use of Credit | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Loan Fees | - | - | 27,000 | - | - | - | - | 93,000 | - | - | - | - | - | - | - | - |
| DIP Loan Expense | - | - | 30,000 | - | - | - | - | - | - | - | - | - | - | - | - | 30,000 |
| DIP Loan Interest Expense | 30,000 | - | - | - | - | - | 6,750 | - | - | - | 30,000 | - | - | - | - | - |
| IRS Secured Claim | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Land Lease/Cure Payments | - | - | - | 22,200 | - | - | - | 125,000 | - | - | - | - | - | - | - | - |
| Utility Deposits | 15,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | | | | | | | | | | | | | | | | |
| Appraisals | - | - | - | - | - | - | - | 50,000 | - | - | - | - | - | - | - | - |
| Humscrest | - | - | - | - | - | - | - | 160,000 | - | 55,000 | - | - | - | 120,000 | - | - |
| Groves & Mackley | - | - | - | - | - | - | - | 125,000 | - | - | - | - | - | 125,000 | - | - |
| Tax Accountants | - | - | - | - | - | - | - | - | - | - | - | - | - | 25,000 | - | - |
| Committee Counsel | - | - | - | - | - | - | - | - | 4,875 | - | - | - | - | - | - | - |
| UST Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Disbursements | 45,000 | - | 57,000 | 22,200 | - | - | 6,750 | 553,000 | 4,875 | 55,000 | 30,000 | - | - | 270,000 | - | 30,000 |
| Total Non-Operating Cash Flow | (45,000) | (45,000) | 618,000 | (22,200) | - | 550,800 | (6,750) | 1,772,000 | (4,875) | (55,000) | (30,000) | - | - | (270,000) | - | (30,000) |
| Accumulated Cash Flow | (45,000) | (45,000) | 573,000 | 550,800 | 550,800 | 550,800 | 544,050 | 2,316,050 | 2,311,175 | 2,296,175 | 2,266,175 | 2,266,175 | 2,266,175 | 1,996,175 | 1,996,175 | 1,966,175 |
| Lowest Account Cash Value | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | 43,442 | 95,686 | 58,788 | 502,802 | 371,165 | 314,085 | 338,066 | 200,067 | 1,959,845 | 1,776,047 | 1,776,345 | 1,648,272 | 1,677,620 | 1,642,108 | 1,509,947 | 1,563,076 |
| Cash Flow - Operations | 97,244 | (36,898) | (125,986) | (131,427) | (61,281) | 23,982 | (130,510) | (12,262) | (178,848) | 15,658 | (96,673) | 29,348 | (35,562) | 157,838 | 53,129 | 146,448 |
| Cash Flow - Non Operating | (45,000) | (45,000) | 628,000 | (22,200) | - | 550,800 | (6,750) | 1,772,000 | (4,875) | (55,000) | (30,000) | - | - | (270,000) | - | (30,000) |
| Ending Cash Balance | 95,686 | 58,788 | 502,802 | 371,165 | 314,085 | 338,066 | 200,067 | 1,959,845 | 1,776,047 | 1,776,345 | 1,648,272 | 1,677,620 | 1,642,108 | 1,509,947 | 1,563,076 | 1,676,524 |
| Lowest Account Cash Value | 95,686 | 58,788 | | | | | | | | | | | | | | |

6.5%
8.0%
12%

(45,000)    30-May-11
58,788      6-Jun-11

Disclaimer: This presentation estimates estimated performance of the Company based on historical data, estimates, and assumptions. It cannot be relied upon to reflect actual results.

# Weekly Budget for Oban Agriculture LLC

| | Week | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | beginning | 19-Sep-11 | 26-Sep-11 | 4-Oct-11 | 10-Oct-11 | 17-Oct-11 | 24-Oct-11 | 31-Oct-11 | 7-Nov-11 | 14-Nov-11 | 21-Nov-11 | 28-Nov-11 | 5-Dec-11 | 12-Dec-11 | 19-Dec-11 | 26-Dec-11 | Total |
| **Receipts:** | | | | | | | | | | | | | | | | | |
| 200 | Seed | | | | | | | | | | | | | | | | 1,742,000 |
| 400 | Mint (wt) | 175,000 | | | 1,000,000 | | | | | | | | | | | 34,000 | 1,535,000 |
| 500 | Row crops | | | | | | | | | | | | | | | | 102,000 |
| 600 | Fruit (blueberry) | 6,000 | 2,000 | 2,000 | 2,000 | 1,000 | | 1,000 | | | | | | | | | 77,000 |
| 700 | Nut | | | | | | | | | | | | | | | | 40,000 |
| 900 | Wine & Grapes | 5,000 | 5,000 | 30,000 | 36,000 | 80,000 | 80,000 | 79,000 | 79,000 | 79,000 | 75,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 930,000 |
| 900 | Rent | | | | 3,000 | | | | 3,000 | | | | | 3,000 | | | 32,000 |
| | **Total Receipts** | 258,000 | 75,000 | 326,000 | 1,158,000 | 149,000 | 149,000 | 148,000 | 152,000 | 143,000 | 143,000 | 98,000 | 50,000 | 87,500 | 104,000 | 154,000 | 4,467,000 |
| **Disbursements:** | | | | | | | | | | | | | | | | | |
| | Brokerage fees | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 300 | 300 | 300 | 300 | 26,040 |
| | Rent (Land Leases) | | | | | | | | 450,000 | | | | | | | | 450,000 |
| | Chemicals & Fertilizer | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | | | 4,000 | 375,000 |
| | Fuel, Oil & Nat. Gas | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 6,500 | 1,090 | 1,030 | 1,090 | 6,500 | 1,090 | 4,000 | 4,000 | 1,090 | 418,000 |
| | Misc Production costs | | | | | | | | | | | | | | | | 41,924 |
| | Property Taxes - Current | | | | | | | | 24,000 | | | | | | | | 24,000 |
| | Utilities | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 83,000 |
| | Repairs & Maintenance | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | | 300 | 50,000 |
| | Misc. Maint. Supplies | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | | 1,000 | 10,230 |
| | Shipping & Handling | 75,000 | | 75,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 60,000 | | 60,000 | | 55,000 | 55,000 | 55,000 | 31,000 |
| | Wine Processing and Bottling | 8,250 | 70,000 | 70,000 | 25,000 | 100,000 | | 100,000 | | | | 6,600 | | 6,650 | 6,590 | 6,590 | 261,200 |
| | Payroll | 788 | | 7,300 | 11,000 | 11,000 | | 11,000 | 788 | 6,600 | 788 | 6,600 | 788 | 788 | 788 | 788 | 1,300,000 |
| | Payroll Tax Expense | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 143,000 |
| | Sales & Marketing Expense | | | | | | | | 2,896 | | | | 2,896 | | | | 24,443 |
| | Admin Expenses | 9,910 | | | | | 9,910 | | 2,730 | | 9,910 | | 788 | 788 | | 9,910 | 20,269 |
| | Insurance | 7,200 | 7,200 | 2,730 | 7,000 | 7,000 | 7,200 | 2,730 | 2,730 | 9,938 | 9,510 | 7,200 | 2,730 | 7,200 | 7,200 | 7,200 | 69,310 |
| | Equipment Lease | | 7,200 | | | | | | 854 | | | 854 | 854 | | | | 114,510 |
| | Contingency | 6,301 | 1,743 | 6,800 | 2,653 | 8,333 | 1,414 | 7,828 | 25,840 | 3,938 | 1,104 | 4,258 | 2,730 | 3,500 | 647 | 4,355 | 172,229 |
| | **Total Disbursements** | 136,120 | 36,612 | 542,793 | 55,302 | 179,202 | 71,692 | 155,377 | 543,633 | 83,267 | 23,382 | 66,267 | 17,917 | 73,498 | 9,396 | 92,464 | 3,613,564 |
| | | | | | | | | | | | | | | | | | |
| | Cash Flow from Operations | 121,760 | 38,388 | (37,793) | 1,252,698 | (30,202) | 77,308 | (7,577) | (392,633) | 66,293 | 125,818 | 32,373 | 32,071 | 13,502 | 94,604 | 12,516 | 834,436 |
| | Accumulated Cash Flow | (306,510) | (267,904) | (305,738) | 846,980 | 816,779 | 894,087 | 886,510 | 493,876 | 554,170 | 679,988 | 681,721 | 713,793 | 727,295 | 823,900 | 834,436 | 834,436 |
| | Lowest Accum Cash Value | (306,510) | (267,904) | (255,738) | 846,980 | 816,779 | 894,087 | 886,510 | 493,876 | 554,170 | 679,988 | 681,721 | 713,793 | 727,295 | 823,900 | 834,436 | |

(467,920)    22-Aug-11

Disclaimer: This presentation estimates performance of the Company based on historical data, estimates, and assumptions. It cannot be relied upon to reflect actual results.

CONFIDENTIAL
Page 4 of 4
6/14/2011 1:46 PM

**Weekly Budget for Olson Agriculture LLC**

| | Week beginning | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 19-Sep-11 | 26-Sep-11 | 3-Oct-11 | 10-Oct-11 | 17-Oct-11 | 24-Oct-11 | 31-Oct-11 | 7-Nov-11 | 14-Nov-11 | 21-Nov-11 | 28-Nov-11 | 5-Dec-11 | 12-Dec-11 | 19-Dec-11 | 26-Dec-11 | |
| **Non-Operating Items** | | | | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | | | | |
| DIP Financing | | | | | | | | | | | | | | | | | 3,000,000 |
| Equipment Sales | | | | | | | | | | | | | | | | | |
| Land Sales | | | | | | | | 1,000,000 | | | | | | | | | 1,000,000 |
| Total Receipts | | | | | | | | 1,000,000 | | | | | | | | | 4,000,000 |
| **Disbursements** | | | | | | | | | | | | | | | | | |
| Robo-Mow | 6.5% | | | | | | | 84,381 | | | | 84,381 | | | | 84,381 | 252,842 |
| Robo-Mow Line of Credit | 8.0% | | | | | | | 94,927 | | | | 94,927 | | | | 94,927 | 284,780 |
| DIP Loan Fees | | | | | | | | | | | | | | | | | 120,000 |
| DIP Loan Expense | | | | | | | | | | | | | | | | | 60,000 |
| DIP Loan Interest Expense | 12% | | | | 30,000 | | | | 30,000 | | | | | 30,000 | | | 156,750 |
| Land Lease Cure Payments | | | | | | | | | | | | | | | | | 175,000 |
| Utility Deposits | | | | | | | | | | | | | 300,000 | | | | 300,000 |
| **Professional Fees** | | | | | | | | | | | | | | | | | |
| Appraisals | | | | | | | | | | | | | | | | | 65,000 |
| Hamstreet | | | | | 100,000 | | | | 100,000 | | | | | | | 140,000 | 400,000 |
| Greene & Markley | | | | | 125,000 | | | | 125,000 | | | | | | | 125,000 | 425,000 |
| Tax Accountants | | | | | 25,000 | | | | | | | | | | | | 50,000 |
| Committee Counsel | | | | | | | 6,500 | | | | | | | | | | |
| UST Fees | | | | | | | | | | | | | | | | | 13,175 |
| Total Disbursements | | | | | 250,000 | 30,000 | | 6,500 | 179,207 | 255,000 | | | 179,207 | 300,000 | 30,000 | | 444,207 | 2,793,847 |
| **Total Non-Operating Cash Flow** | | | | | (250,000) | (30,000) | | (6,500) | 820,793 | (255,000) | | | (179,207) | (300,000) | (30,000) | | (444,207) | 1,250,053 |
| Accumulated Cash Flow | | | | | 1,716,175 | 1,686,175 | 1,486,175 | 1,679,675 | 2,500,468 | 2,245,468 | 2,245,468 | 2,066,260 | 1,766,260 | 1,736,260 | | 1,292,053 | 1,292,053 |
| Lowest Account Cash Value | (45,000) | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | 30-May-11 | 1,679,524 | 1,853,304 | 1,841,693 | 1,553,899 | 2,576,597 | 2,546,396 | 2,617,204 | 3,490,420 | 2,762,786 | 3,843,080 | 2,962,897 | 2,791,633 | 2,523,496 | 2,506,998 | 2,621,602 | |
| Cash Flow - Operations | | 123,780 | 38,388 | (12,791) | 1,052,698 | (30,202) | 77,208 | (72,677) | 895,618 | 82,293 | 129,818 | (179,207) | 32,073 | (80,000) | 94,604 | 123,556 | |
| Cash Flow - Non Operating | 6-Jun-11 | | | (250,000) | (30,000) | | (6,500) | 820,793 | (255,000) | | | (179,207) | (300,000) | (80,000) | | (444,207) | |
| Ending Cash Balance | 58,788 | 1,853,304 | 1,841,693 | 1,553,899 | 2,576,597 | 2,546,396 | 2,617,204 | 3,490,420 | 2,762,786 | 3,843,080 | 2,962,897 | 2,791,633 | 2,523,496 | 2,506,998 | 2,621,602 | 2,169,931 | 2,169,931 |
| Lowest Account Cash Value | | | | | | | | | | | | | | | | 2,169,931 | |

Disclaimer: This presentation estimates performance of the Company based on historical data, estimates, and assumptions. It cannot be relied upon to reflect actual results.