**DISTRICT OF OREGON**

**F I L E D**

**June 23, 2011**

**Clerk, U.S. Bankruptcy Court**

Below is an Order of the Court.

FRANK R. ALLEY
U.S. Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT

### DISTRICT OF OREGON

| | |
|---|---|
| In re | ) |
| | ) Case No. 11-62723-fra11 |
| Olsen Agricultural Enterprises LLC, | ) |
| an Oregon limited liability company, | ) Chapter 11 |
| | ) |
| Debtor. | ) FINAL ORDER AUTHORIZING |
| | ) DEBTOR TO OBTAIN POSTPETITION |
| | ) SECURED FINANCING AND |
| | ) GRANTING ADEQUATE PROTECTION |
| | ) TO PREPETITION SECURED PARTIES |
| | ) |
| | ) |

A preliminary hearing was held on June 13, 2011, to consider the Motion for

Authorization to Obtain Secured Credit on Interim and Final Basis [Dkt #34] filed by Olsen

Agricultural Enterprises LLC (the "Debtor"), as debtor in possession. Based on the evidence

presented at the preliminary hearing and on the entire record of this case, the Court granted the

motion on an interim basis and authorized the Debtor to obtain advances from Bacchus Capital,

L.P. in the aggregate principal amount of $675,000 in accordance with the terms set forth in the

term sheet attached to the motion as Exhibit A, subject to the limitations and qualifications described by the Court on the record while announcing its decision, so as to avoid immediate and irreparable harm to the estate pending a final hearing. On June 16, 2011, the Court entered herein as Document #79 its Interim Order (I) Authorizing Debtor to Obtain Postpetition Secured Financing, (II) Granting Adequate Protection to Prepetition Secured Parties and (III) Scheduling a Final Hearing (the "Interim Order"). On June 17, 2011, the Debtor filed its Motion to Amend the Interim Order [Dkt #80] (the "Motion to Amend"). On June 20, 2011, at the hearing to consider the Motion to Amend, (i) the Debtor withdrew the Motion to Amend and informed the Court and other parties that Rabo Agrifinance, Inc. ("Rabo" or the "DIP Lender") and the Debtor had agreed to the terms of a debtor in possession loan facility for a loan (the "DIP Loan") in the aggregate amount of $3,000,000 on terms more favorable to the estate than those approved by the Interim Order, and (ii) the Court approved, on a final basis, the DIP Loan to be provided by Rabo and cancelled the hearing scheduled for July 13, 2011. Based on the entire record of this case, the Court makes the following findings of fact and conclusions of law:

A.    On June 1, 2011 (the "Petition Date"), the Debtor filed herein a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtor is continuing in the management and possession of its business and properties as debtor in possession under sections 1107 and 1108 of the Bankruptcy Code. On June 9, 2011, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the United States trustee. As of the date hereof, no trustee or examiner has been requested or appointed in this case.

B.    The Debtor is the surviving entity of a merger transaction that was consummated on June 1, 2011. In the merger transaction, Olsen Agricultural Company, Inc., an Oregon

corporation ("OAC"), Jenks-Olsen Land Co., an Oregon general partnership ("JOLC"), Olsen

Vineyard Company, LLC, an Oregon limited liability company ("OVC"), and The Olsen Farms

Family Limited Partnership ("OFFLP") were merged with and into the Debtor.  OAC, JOLC,

OVC and OFFLP were co-borrowers under the term loan originally made by AXA Equitable

Life Insurance Company and subsequently purchased by Rabo, and OAC, JOLC and OVC were

co-borrowers under the line of credit loans made by Rabo.  In connection with the merger

transaction, other related parties that pledged real estate collateral to support the line of credit

loans agreed to contribute such property to the Debtor in exchange for the right to receive

ownership interests in the Debtor.

C.    The Debtor operates an agricultural enterprise on approximately 7,762 acres of

owned and leased land located in Benton, Linn and Polk Counties.  Its business is  comprised

principally of three divisions:  (a) Olsen Seed Company, which produces and sells a variety of

grass seed and grains on approximately 5,934 acres; (b) Olsen Agriculture, which grows and

sells peppermint, nursery stock, squash, hazelnuts and blueberries on approximately 1,334 acres;

and (c) Olsen Family Vineyards, which grows a variety of grapes on approximately 494 acres

and produces and sells quality wines under the "Viridian" label as well as private labels.  As of

the date hereof, the Debtor has 45 employees, including management personnel.

D.    The following creditors (each an "Existing Secured Creditor" and collectively, the

"Existing Secured Creditors") have or may claim to have a security interest in or lien on property

of the estate (the respective liens of the Existing Secured Creditors being referred to herein as the

"Existing Liens") that will be affected by the "priming" liens to be granted to the DIP Lender

hereunder:

       (1)      Rabo;

       (2)      BFS International, LLC;

       (3)      United States of America, acting by and through the Internal Revenue Service;

       (4)      Ledeboer Seed, LLC;

       (5)      Callisons, Inc. d/b/a I.P. Callisons and Sons; and

       (6)      West Coast Bank.

E.      In requesting postpetition financing, the Debtor acknowledges, represents, stipulates, and agrees that:

(i)      as consideration for the DIP Loan, the Debtor hereby agrees that until such time as all obligations of the Debtor under the DIP Loan and this Order (collectively, the "DIP Loan Obligations") are indefeasibly paid in full in cash and the commitments related thereto are terminated, the Debtor shall not in any way grant, seek to grant, or cause to be granted any lien and/or claim that is senior to or *pari passu* with any of the liens, security interests and claims provided under this Order to the DIP Lender, including, without limitation, by offering a subsequent lender or any other party a superior or *pari passu* lien or claim pursuant to Bankruptcy Code section 364(d), or otherwise, except with respect to the Carve-Out; and

(ii)      the DIP Lender is not and shall not be deemed to be a control person or insider of the Debtor by virtue of any of the actions taken by such parties in respect of or in connection with the DIP Loan Obligations.

F.      The Debtor requires the financing described in the motion to fund the necessary and critical ordinary course expenses of maintaining and preserving its business and for other

Page 4 of 24- FINAL ORDER AUTHORIZING DEBTOR TO OBTAIN POSTPETITION SECURED
            FINANCING AND GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED
            PARTIES                         \7095\p FINAL Order Finance.doc

purposes contemplated by the budget attached hereto as <u>Exhibit A</u> (as updated and revised from time to time in accordance with the terms of this Order, the "Approved Budget"), subject to the variances permitted herein.  If the Debtor does not obtain authorization to borrow under this Order and the DIP Loan is not approved, the Debtor will suffer immediate and irreparable harm.  The Debtor is unable to obtain adequate unsecured credit allowable as an administrative expense under Bankruptcy Code section 503, or other financing under Bankruptcy Code sections 364(c) or (d), on equal or more favorable terms than those set forth in this Order based on the totality of the circumstances.  Moreover, loan advances in the amount provided by this Order are not available to the Debtor without granting the DIP Lender superpriority claims, priming liens, and security interests, pursuant to Bankruptcy Code sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d), as provided in this Order.  After considering all alternatives, the Debtor determined, in the exercise of its prudent business judgment, that the DIP Loan represents the best financing package available to it and is in the best interests of the estate.  The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and adequately protect any non-consenting parties' interests in the Collateral (as defined in paragraph 5(a) below).

G.    Sufficient and adequate notice of the interim hearing on the motion and of this Order have been given in accordance with Bankruptcy Rule 4001, and no other or further notice need be given for entry of this Order.

H.    The Debtor has requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(c).  The motion and this Order comply with Local Bankruptcy Rule 4001-2.  The relief granted herein is necessary to avoid immediate and irreparable harm to the estate.  Entry of

this Order is in the best interests of the Debtor's estate as its implementation will provide for

payment of the necessary and critical ordinary course expenses of maintaining and preserving the

Debtor's business and will further enhance the Debtor's prospects for a successful

reorganization.

Based upon the foregoing findings, acknowledgements, and conclusions, and good and

sufficient cause appearing therefor, it is hereby

ORDERED that:

1.      Disposition.  The motion is granted on a final basis, subject to the terms set forth

herein, and the terms and provisions of the DIP Loan are approved.  Any objections to the

Motion that have not previously been withdrawn or resolved are hereby overruled on their

merits.

2.      Authorization.  The Debtor is hereby authorized to immediately obtain advances

under the DIP Loan, pursuant to the terms of this Order, in an aggregate principal amount not to

exceed $3,000,000 in the aggregate.  Advances under the DIP Loan shall be used by the Debtor

to fund its expenses in accordance with the Approved Budget (and the variances permitted

thereto).

3.      Authority to Execute and Deliver Necessary Documents.

(a)      The Debtor is authorized to negotiate, prepare, enter into, and deliver such

agreements, instruments and documents as may be reasonably necessary or desirable to evidence

or secure the DIP Loan Obligations consistent with the terms of this Order (collectively, the

"DIP Loan Documents").

(b)      The Debtor is hereby further authorized to (i) perform all of its obligations

under the DIP Loan Documents and this Order, and (ii) perform all acts required under the DIP Loan Documents and this Order, including, without limitation, the payment of loan fees and the reimbursement of costs and expenses (including, without limitation, the DIP Lender's attorneys' and other advisors' fees and expenses), paid or incurred by the DIP Lender in its capacity as such as provided for in the DIP Loan Documents.  All such unpaid fees, costs, and other expenses shall be included and constitute part of the principal amount of the DIP Loan Obligations and be secured by the Collateral as provided in the DIP Loan Documents and this Order.

(c)     All DIP Loan Obligations shall constitute valid and binding obligations of the Debtor, enforceable against it and its successors and assigns (including, without limitation, any trustee or other estate representative in this Chapter 11 case or in any superseding Chapter 7 case), in accordance with the terms of the DIP Loan Documents and the terms of this Order, and no obligation, payment, transfer or grant of security under the DIP Loan Documents or this Order shall be voidable or recoverable under the Bankruptcy Code or under any other applicable law or subject to any avoidance, recharacterization, subordination (whether equitable, contractual or otherwise), or any other challenges under the Bankruptcy Code or any other applicable law or regulation by any person or entity.

4.     DIP Lender's Superpriority Claim.  The DIP Lender is hereby granted an allowed superpriority administrative expense claim (the "Superpriority Claim") pursuant to Bankruptcy Code section 364(c)(1) for all DIP Loan Obligations, having priority over any and all other administrative expense claims, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under Bankruptcy Code sections 503(b), 507(b), or otherwise, subject and subordinate in

priority of payment only to the payment of the Carve-Out.  Except as set forth herein, no other

superpriority administrative expense claims under Bankruptcy Code section 364(c)(1) shall be

granted or allowed in this Chapter 11 case.

       5.     <u>DIP Liens</u>.

       (a)     The DIP Loan Obligations shall be secured by the following liens

(collectively, the "DIP Liens"):

       (i)     valid, properly perfected, first priority senior liens on all now

existing and hereafter acquired (whether before or after the Petition Date) property of the Debtor

of any nature whatsoever, real and personal, tangible and intangible, including, without

limitation, accounts receivable, general intangibles, payment intangibles, supporting obligations,

investment property, development orders, environmental permits or other approvals to develop

any real property, machinery, equipment, subsidiary capital stock, chattel paper, documents,

instruments, deposit accounts, contract rights, tax refunds, and all rights, claims, and other causes

of action of the Debtor and the Debtor's estate (including any actions asserted by the Debtor or

any subsequently appointed trustee or representative of the Debtor's estate under any section of

the Bankruptcy Code, and in each case, all proceeds resulting therefrom, excluding, however,

avoidance actions under sections 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy

Code (collectively, the "Collateral"), pursuant to section 364(d)(1) of the Bankruptcy Code, with

such liens securing the DIP Loan Obligations to prime and be senior in priority to all existing

security interests in and liens on the Collateral other than (A) statutory liens that secure claims of

governmental units for ad valorem property taxes or similar impositions, and (B) validly

perfected purchase money security interests in equipment extant as of the Petition Date

Page 8 of 24- FINAL ORDER AUTHORIZING DEBTOR TO OBTAIN POSTPETITION SECURED
       FINANCING AND GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED
       PARTIES         \7095\p FINAL Order Finance.doc

(collectively, the "Non-Primed Liens"); provided, however, if it is determined that the Debtor has an interest in any commercial tort claims or tax refunds that are property of the Debtor's estate, the proceeds of such interests shall be part of the Collateral;

(ii)    perfected, first-priority senior liens, pursuant to section 364(c)(2) of the Bankruptcy Code, on that portion of the Collateral that is unencumbered property of the Debtor; and

(iii)    perfected, second-priority liens, pursuant to Bankruptcy Code section 364(c)(3), on that portion of the Collateral subject to any Non-Primed Liens.

(b)    In each case, the Collateral shall also include any and all rents, issues, products, offspring and profits generated by any item of Collateral, without the necessity of any further action or any kind or nature by the DIP Lender in order to claim or perfect such interests.

(c)    The DIP Liens shall not at any time be (i) made subject or subordinate to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under Bankruptcy Code section 364(d) or otherwise, other than the Non-Primed Liens, or (ii) subject to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under Bankruptcy Code section 551.

(d)    The DIP Liens, Superpriority Claim, and other rights and remedies granted under this Order to the DIP Lender shall continue in this Chapter 11 case and in any superseding Chapter 7 case, and such liens and security interests shall maintain their priority as provided in this Order until all the DIP Loan Obligations have been indefeasibly paid in full in cash and completely satisfied and the DIP Lender's commitments have been terminated in accordance with the DIP Loan Documents.

6.      <u>Fees</u>.  The Debtor is hereby authorized to pay all interest, fees, costs, and expenses in accordance with the terms of the DIP Loan Documents and this Order, without the DIP Lender or its counsel having to file any further application with this Court for approval or payment of such fees, costs or expenses; provided, however, that the DIP Lender shall furnish summary documentation (which may be redacted in part) of the same to the United States trustee and the Committee upon written request.  Such fees include a commitment fee in the amount of $30,000, which is fully earned and payable.

7.      <u>Amendments, Consents, Waivers, and Modifications</u>.  The Debtor and the DIP Lender may enter into any non-material amendments, consents, waivers or modifications to the DIP Loan Documents, including amendments to the Approved Budget, in each case without the need for further notice and hearing or any order of this Court; provided, however, that no such amendment or waiver shall increase the amount of the DIP Lender's lending commitment.

8.      <u>Term</u>.  All DIP Loan Obligations shall be due and payable, and repaid in full, in cash, on the date (the "Maturity Date") that is the first to occur of: (i) February 15, 2012; (ii) the effective date of a plan of reorganization confirmed in this Chapter 11 case; (iii) conversion or dismissal of this Chapter 11 case; (iv) appointment of a trustee in this Chapter 11 case; or (v) the occurrence of an Event of Default under and as defined in this Order.

9.      <u>Interest on DIP Loan Obligations</u>.  Interest on the DIP Loan Obligations shall accrue at a fixed rate of ten percent (10%) per annum and shall be payable monthly in arrears. The default rate of interest will be four percent (4%) higher than the rate otherwise payable.

10.     <u>Adequate Protection for Existing Secured Creditors</u>.  The Existing Secured Creditors have not consented to the incurrence of the DIP Loan Obligations by the Debtor under

the DIP Loan Documents and the Debtor's granting of priming liens in connection therewith. The Debtor acknowledges and stipulates that the Existing Secured Creditors are entitled, pursuant to Bankruptcy Code sections 361 and 364(d)(1), to adequate protection of their respective interests in the Debtor's prepetition property (the "Prepetition Collateral") in exchange for the priming of their respective security interests in and liens on the Prepetition Collateral by the DIP Liens being granted to the DIP Lender pursuant to the DIP Loan Documents and this Order.  As adequate protection, the Existing Secured Creditors are hereby granted the protections described in clauses (a) and (b) below:

(a)    Adequate Protection Liens.  Pursuant to Bankruptcy Code sections 361 and 364(d), as adequate protection of the respective interests of the Existing Secured Creditors in the Prepetition Collateral against any diminution in the value of their interests in the Prepetition Collateral resulting from the grant of the DIP Liens, each of the Existing Secured Creditors is hereby granted a continuing valid, binding, enforceable and perfected postpetition lien on the Collateral (the "Adequate Protection Liens").  The Adequate Protection Liens shall be junior in priority only to (i) the DIP Liens, (ii) the Replacement Liens, as such term is defined in the Interim Order Authorizing Debtor to Use Cash Collateral entered herein on June 3, 2011, as Document #23 and in the Final Order Authorizing Debtor to Use Cash Collateral entered herewith (collectively, the "Cash Collateral Orders"), and (iii) all validly perfected and enforceable security interests in and liens on the Collateral extant as of the Petition Date; and shall have the same validity, enforceability and relative priorities as the Existing Liens.

(b)    Adequate Protection Claims.  As further adequate protection of the respective interests of the Existing Secured Creditors in the Prepetition Collateral against any

diminution in the value of their interests in the Prepetition Collateral resulting from the grant of

the DIP Liens, each of the Existing Secured Creditors shall have an administrative expense claim

under Bankruptcy Code section 503(b) that will have superpriority as provided in Bankruptcy

Code section 507(b) (the "Adequate Protection Claims").  The Adequate Protection Claims shall

be junior in priority to (i) the DIP Lender's Superpriority Claim, and (ii) the superpriority

administrative expense claims awarded to the Existing Secured Creditors under the Cash

Collateral Orders.

      11.    <u>Carve-Out</u>.

      (a)    Upon the occurrence and during the continuance of an Event of Default

with respect to which the DIP Lender provides written notice to the Debtor of the cessation of

funding under the DIP Loan Documents (the "Carve-Out Trigger Notice"), to the extent

unencumbered funds are not available to pay allowed administrative expenses in full, the DIP

Liens, the Superpriority Claim, the Adequate Protection Claims and the Adequate Protection

Liens shall be subject to the payment of the "Carve-Out," which shall mean (i) an amount not to

exceed $300,000 on account of all allowed professional fees and expenses incurred by the estate

professionals prior to delivery of the Carve-Out Trigger Notice, but which fees and expenses

shall not exceed the amounts set forth in the Approved Budget for such items through the date of

such notice less any amounts actually paid to or on account of such professionals with respect to

such period of time; plus (ii) $50,000 for the payment of allowed professional fees and expenses

(including those of a Chapter 7 trustee and its professionals) incurred by the estate arising after

delivery of the Carve-Out Trigger Notice; plus (iii) fees incurred pursuant to 28 U.S.C. §

1930(a)(6) and fees payable to the clerk of the Bankruptcy Court.  All amounts payable as part of

Page 12 of 24- FINAL ORDER AUTHORIZING DEBTOR TO OBTAIN POSTPETITION SECURED
        FINANCING AND GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED
        PARTIES           \7095\p FINAL Order Finance.doc

the Carve-Out shall only be paid to the extent subsequently allowed by order of this Court.

(b)    The DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any professionals incurred in connection with this Chapter 11 case or any superseding Chapter 7 case.  Nothing in this Order or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to or reimburse expenses of any professional in this case, or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement.

(c)    No liens, claims, interests or priority status, other than the Carve-Out, having a lien or administrative priority superior to *pari passu* with that of the DIP Liens or the Superpriority Claim granted by this Order, shall be granted while any portion of the DIP Loan Obligations remain outstanding, or any commitment under the DIP Loan Documents remains in effect, without the prior written consent of the DIP Lender.

(d)    No party shall be entitled, directly or indirectly, to charge the Carve-Out or the Collateral, whether by operation of Bankruptcy Code sections 105, 506(c) or 552(b) or otherwise.

12.    <u>Release</u>.  The Debtor, on behalf of itself and its estate (including any successor trustee or other estate representative in this Chapter 11 case or in any superseding Chapter 7 case), forever and irrevocably (i) releases, discharges, and acquits the DIP Lender, and each of its respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action,

indebtedness, and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation and entry into the DIP Loan Documents, and (ii) waives any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and nonavoidability of the DIP Liens and Superpriority Claim.

13.    <u>Limitation on Additional Surcharges</u>.  No action, inaction or acquiescence by the DIP Lender, including funding the Debtor's ongoing operations under this Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Lender to a charge against the Collateral pursuant to Bankruptcy Code sections 506(c), 552(b) or 105(a), and as provided in paragraph 11(d) above, no such costs, fees or expenses shall be so charged against the Collateral without the prior written consent of the DIP Lender, to the extent of its interests in such Collateral.

14.    <u>Additional Perfection Measures</u>. The DIP Liens and the Adequate Protection Liens shall be perfected by operation of law immediately upon entry of this Order.  None of the Debtor, the DIP Lender, or the Existing Secured Creditors shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction, or obtain consents from any licensor or similarly situated party in interest, or take any other action in order to validate and to perfect the DIP Liens or the Adequate Protection Liens.  The DIP Lender and Existing Secured Creditors may, but shall not be obligated to, file a true and complete copy of this Order in any place at which any such instruments would or could be filed, together with a description of

Collateral or Prepetition Collateral, as applicable, and such filings by the DIP Lender and the

Existing Secured Creditors shall have the same effect as if such mortgages, deeds of trust,

financing statements, notices of lien or similar instruments had been filed or recorded at the time

and on the date of entry of this Order.

   15. <u>Events of Default</u>.  The occurrence of any of the following shall constitute an

Event of Default under this Order upon five (5) business days' written notice to the Debtor by

the DIP Lender:

     (a) the failure to pay the DIP Loan Obligations in cash in full upon the

Maturity Date, or when due if prior to the Maturity Date;

     (b) breach by the Debtor of any of its representations, warranties or covenants

under the DIP Loan Documents, which breach is not cured within ten (10) business days of

written notice by the DIP Lender to the Debtor of such breach and written notice shall also be

provided to the U.S. Trustee and the Committee;

     (c) the filing of a plan of reorganization for the Debtor that (i) is not

acceptable to the DIP Lender in its sole and absolute discretion, or (ii) does not provide for the

payment in cash in full of the DIP Loan Obligations;

     (d) entry of an order to recover from any portion of the Collateral any costs or

expenses of preserving or disposing of such Collateral under Bankruptcy Code section 506(c);

     (e) the occurrence of a Material Adverse Effect as that term is defined in the

DIP Loan Agreement; or

     (f) the commencement of litigation which, if successful, would have a

material adverse impact on the Debtor's ability to repay the DIP Loan Obligations.

Page 15 of 24- FINAL ORDER AUTHORIZING DEBTOR TO OBTAIN POSTPETITION SECURED
     FINANCING AND GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED
     PARTIES        \7095\p FINAL Order Finance.doc

16.    <u>Consequences of Events of Default; Automatic Stay Vacated and Modified</u>.

(a)    Upon the occurrence of an Event of Default, (x) the automatic stay of Bankruptcy Code section 362 is hereby modified to the extent necessary to permit the DIP Lender to immediately (A) deliver a notice of an Event of Default, and (B) terminate or suspend any outstanding advances or use thereof, and (y) after five (5) business days' written notice from the DIP Lender to the Debtor and the Committee of an Event of Default (within which period the Debtor may only dispute the DIP Lender's declaration of an Event of Default on the basis of the events described in paragraph 15(b), 15(e) and 15(f) above in the Bankruptcy Court on an expedited basis), the automatic stay shall terminate, without further order of the Court and without the need for filing any motion for relief from the automatic stay or any other pleading, for the limited purpose of permitting the DIP Lender to do any one or more of the following:  (A) charge the default rate of interest on the DIP Loan Obligations, and (B) declare the principal of and accrued interest, fees and expenses constituting the DIP Loan Obligations to be due and payable.  Upon and after the occurrence of an Event of Default, except as provided in the preceding sentence, the DIP Lender shall be required to file a motion seeking relief from the automatic stay (a "Stay Motion") to enforce any of its other rights or remedies, which motion shall be heard on no more than five (5) days' notice and the only issue to be adjudicated on the Stay Motion shall be whether an Event of Default occurred under the DIP Loan Documents or this Order.  The Debtor is deemed to waive any right under Bankruptcy Code section 105 to enjoin the exercise of the rights and remedies by the DIP Lender following an Event of Default.

(b)    Prior to the occurrence of an Event of Default, the Debtor shall have the right to use the Collateral as cash collateral (as that term is defined in Bankruptcy Code section

363(a)) in accordance with the Approved Budget and this Order.  Upon the occurrence and

during the continuance of an Event of Default, the Debtor's right to use the Collateral as cash

collateral shall terminate automatically and without any further notice from the DIP Lender.

(c)    The rights and remedies of the DIP Lender specified herein are cumulative

and not exclusive of any rights or remedies that the DIP Lender may have under the DIP Loan

Documents or otherwise.  The Debtor shall cooperate fully with the DIP Lender in its exercise of

rights and remedies, whether against the Collateral or otherwise.

(d)    This Court shall retain exclusive jurisdiction to hear and resolve any

disputes and enter any orders required by the provisions of this Order and relating to the

application, re-imposition or continuance of the automatic stay of Bankruptcy Code section

362(a) or other injunctive relief requested.

17.    <u>Loan Advances, Budget and Reporting</u>.

(a)    Proceeds from the DIP Loan shall be used exclusively for funding the

expenses which are set forth in the Approved Budget. The Debtor may make expenditures in

excess of the amounts set forth in the Approved Budget so long as the total variance does not

exceed, on a cumulative basis, 15 percent of the total budgeted expenses through the end of the

applicable period, and shall be permitted to carry forward from a prior four-week period to the

next two succeeding four-week periods any unused portion of the actual amounts attributable to

the prior four-week period.  For the avoidance of doubt, no portion of the DIP Loan, the

Collateral securing the DIP Loan, the proceeds of the DIP Loan or the Carve-Out may be used in

connection with discovery proceedings, initiation or prosecution of any claims, causes of action,

objection or other litigation against the DIP Lender in its capacity as such or with respect to the

DIP Loan Obligations.

(b)     On each Friday of every week, beginning June 24, 2011, the Debtor shall deliver via email:  (i) a variance report detailing (x) the cash expenditures for the prior week and a comparison to the Approved Budget for that week, (y) the cumulative cash expenditures for all of the prior weeks since the Petition Date and as compared to the Approved Budget for such weeks, and (z) a narrative explanation of the variances between the actual weekly expenditures and the budgeted weekly expenditures; and (ii) an updated weekly cash flow forecast for the then remaining period of the Approved Budget (the "Updated Budget"), consistent with the Approved Budget (collectively, the "Weekly Reports").  The Weekly Reports shall be in form and substance satisfactory to the DIP Lender.  Subject to the approval of the DIP Lender, which shall not be unreasonably withheld or delayed and which shall not require any further Bankruptcy Court approval, the Updated Budget shall be deemed the Approved Budget.  Compliance with the Approved Budget shall be measured on a weekly basis.

(c)     The Debtor shall additionally provide to the DIP Lender the following reports and information:

(i)     monthly balance sheet, income statement, operating reports, harvested crops and inventory reports, and budget and operating plans for each such monthly period (the "Monthly Reports"); and

(ii)     on an as-requested basis all such other reports and information respecting the Debtor's business, financial condition or prospects as the DIP Lender from time to time reasonably requests.

(d)     The delivery of the Weekly Reports and the Monthly Reports shall be

accompanied by a certification from the Debtor that such Weekly Reports and Monthly Reports are true and correct in all material respects.

18. <u>Access</u>. The DIP Lender and its respective agents and advisors shall have full access, upon reasonable notice during normal business hours, to the Debtor' business records, business premises, and to the Collateral to enable the DIP Lender or its agents and advisors to (a) review, appraise, and evaluate the physical condition of the Collateral, (b) inspect and review the financial records and all other records of the Debtor concerning the operation of the Debtor's business and the Collateral, and (c) evaluate the Debtor's overall financial condition and all other records relating to the operations of the Debtor and the Collateral. The Debtor shall fully cooperate with the DIP Lender regarding such reviews, evaluations, and inspections, and shall make their employees and professionals available to the DIP Lender and its professionals and consultants to conduct such reviews, evaluations, and inspections.

19. <u>Insurance Policies</u>. Upon entry of this Order, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtor which in any way relates to the Collateral. The Debtor is authorized and directed to take any actions necessary to have the DIP Lender be added as an additional insured and loss payee on each insurance policy.

20. <u>Indemnification</u>. The Debtor shall indemnify and hold harmless the DIP Lender, its affiliates and each of the respective officers, directors, members, partners, employees, agents, advisors, attorneys and representatives of each (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or

asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the DIP Loan, this Order, or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Loan, except to the extent such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  In the case of an investigation, litigation or other proceedings to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Debtor, any of its managers, equity owners or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated by the DIP Loan Documents are consummated.  The Debtor further agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtor or any of its equity owners or creditors for or in connection with the transactions contemplated by the DIP Loan Documents, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings)) determined in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

21.    Successors and Assigns.  The provisions of this Order shall be binding upon and inure to the benefit of the Debtor, the DIP Lender, the Existing Secured Creditors, all other creditors and all equity owners, and each of their respective successors and assigns, including,

without limitation, any trustee, responsible officer, estate administrator or representative, or similar person appointed in a case for the Debtor under any chapter of the Bankruptcy Code.

22.    <u>Binding Nature of Agreement</u>.  Each of the DIP Loan Documents to which the Debtor is or will become a party shall constitute legal, valid, and binding obligations of the Debtor, enforceable in accordance with their terms.  The DIP Loan Documents have been or will be properly executed and delivered to the DIP Lender by the Debtor as soon as is practicable after entry of this Order.  The rights, remedies, powers, privileges, liens, and priorities of the DIP Lender provided for in this Order and in the DIP Loan Documents shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order), by any plan in this Chapter 11 case, or by the dismissal or conversion of this Chapter 11 case or any superseding Chapter 7 case unless and until the DIP Loan Obligations have first been indefeasibly paid in full in cash and completely satisfied and the commitments terminated in accordance with the DIP Loan Documents.

23.    <u>Restriction on Use of DIP Lender's Funds</u>.  The Superpriority Claim, the DIP Liens, the Adequate Protection Claims and the Adequate Protection Liens shall be valid and binding liens and claims, enforceable in accordance with the provisions hereof, and no proceeds from the DIP Loan, Collateral or proceeds thereof, or any portion of the Carve-Out may be used to pay any claims for services rendered by any of the professionals retained by the Debtor (or any successor trustee or other estate representative in this Chapter 11 case or in any superseding Chapter 7 case), any creditor or party in interest, any Committee or any other party to investigate, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any

order, judgment, determination or similar relief against, or adverse to the interests of, in any

capacity, the DIP Lender or any of its respective officers, directors, employees, agents, attorneys,

affiliates, assigns, or successors, with respect to:  (i) any action with respect to the validity,

amount and/or extent of the DIP Loan Obligations or the validity, extent, and priority of the DIP

Liens; (ii) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part,

the DIP Liens; and/or (iii) any action that has the effect of preventing, hindering or delaying

(whether directly or indirectly) the DIP Lender's assertion, enforcement or realization on the

Collateral in accordance with the DIP Loan Documents or this Order.

24.     _Priming and Subordination of Liens_.  For avoidance of doubt, and

notwithstanding anything to the contrary herein, all liens on the Collateral in existence on the

date hereof (except the Non-Primed Liens) shall be primed by the DIP Liens and the Adequate

Protection Liens and shall be subordinate to the DIP Liens and the Adequate Protection Liens.

25.     _No Waiver_.  This Order shall not be construed in any way as a waiver or

relinquishment of any rights that the DIP Lender may have to bring or be heard on any matter

brought before this Court.

26.     _No Waiver by Failure to Seek Relief_.  The failure of the DIP Lender to seek relief

or otherwise exercise their rights and remedies under this Order, the DIP Loan Documents, or

applicable law, as the case may be, shall not constitute a waiver of any of the rights thereunder,

or otherwise of the DIP Lender.

27.     _Limits on DIP Lender's Liability_.  Nothing in this Order or in any of the DIP

Loan Documents or any other documents related to this transaction shall in any way be construed

or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any

claims arising from any and all activities by the Debtor in the operation of its business or in connection with its restructuring efforts.

28.     Priority of Terms.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the DIP Loan Documents, the terms and provisions of this Order shall govern.

29.     No Third Party Beneficiary.  Except as expressly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

30.     Survival.  Except as otherwise provided herein, (a) the protections afforded to the DIP Lender and the Existing Secured Creditors under this Order, and any actions taken pursuant thereto, shall survive the entry of an order (i) dismissing this Chapter 11 case, or (ii) converting this Chapter 11 case to a case under Chapter  7, and (b) the DIP Liens, the Adequate Protection Liens, the Superpriority Claim, and the Adequate Protection Claims shall continue in this Chapter 11 case, in any superseding Chapter 7 case or after any such dismissal.  Except as otherwise provided herein, the DIP Liens and the Adequate Protection Liens shall maintain their priorities as provided in this Order, and shall not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness, or any conversion of this Chapter 11 case to a case under Chapter 7 or dismissal of the Chapter 11 case, or by any other act or omission until all DIP Loan Obligations are indefeasibly paid in full in cash and

completely satisfied, and the commitments under the DIP Loan Documents are terminated in accordance therewith.

31.    Proof of Claim.  The DIP Lender is hereby relieved of the requirement to file a proof of claim with respect to any DIP Loan Obligations and any other claims or liens granted hereunder or created hereby.

32.    Effectiveness.  This Order shall be effective as of June 20, 2011, notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, 9014, or otherwise.  This Order supersedes in its entirety the Interim Order, which shall not be effective.

33.    Retention of Jurisdiction.  This Court retains jurisdiction over all matters pertaining to the implementation, interpretation and enforcement of this Order and/or the DIP Loan Documents.

# # #

Presented by:

_____/s/  David A. Foraker_
David A. Foraker, OSB #812280
Greene & Markley, P.C.
1515 SW Fifth Avenue, Suite 600
Portland, OR  97201
Telephone:  (503) 295-2668
Facsimile:   (503) 224-8434
E-mail: david.foraker@greenemarkley.com
Attorneys for Debtor

cc:    ECF Participants

Exhibit A – Approved Budget

CONFIDENTIAL
Page 1 of 4
6/14/2011 5:46 PM

**Weekly Budget for Dove Agriculture LLC**

| | Week beginning | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 30-May-11 | 6-Jun-11 | 13-Jun-11 | 20-Jun-11 | 27-Jun-11 | 4-Jul-11 | 11-Jul-11 | 18-Jul-11 | 25-Jul-11 | 1-Aug-11 | 8-Aug-11 | 15-Aug-11 | 22-Aug-11 | 29-Aug-11 | 5-Sep-11 | 12-Sep-11 |
| **Receipts** | | | | | | | | | | | | | | | | | |
| 200 | Seed | 116,000 | 48,000 | 48,000 | 48,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 68,000 | 68,000 | 68,000 | 68,000 | 68,000 | 68,000 | 68,000 |
| 400 | Misc (net) | | | | | | | | | | | | | 60,000 | 60,000 | 100,000 | 100,000 |
| 500 | Row Crops | | | | | | | | | | | | | | | | |
| 600 | Fruit (Blueberry) | | 16,000 | 16,000 | 16,000 | 31,000 | 16,000 | 12,000 | 12,000 | 12,000 | 11,000 | 11,000 | 12,000 | 11,000 | 6,000 | 6,000 | 6,000 |
| 700 | Nut | | | | | | | | | | | 12,000 | | 13,000 | 6,000 | 6,000 | 6,000 |
| 900 | Wine & Grapes | | 16,000 | 16,000 | 16,000 | | 16,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 9,000 |
| | Rent | 9,000 | | 3,000 | | | | 3,000 | | | | | | 3,000 | | | 3,000 |
| | **Total Receipts** | 130,000 | 64,000 | 67,000 | 64,000 | 71,000 | 56,000 | 55,000 | 52,000 | 52,000 | 91,000 | 94,000 | 91,000 | 151,000 | 186,000 | 186,000 | 186,000 |
| **Disbursements** | | | | | | | | | | | | | | | | | |
| | Brokerage Fees | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 720 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 |
| | Rent (Land Leases) | | 50,000 | 50,000 | 175,000 | | | | | | | | | | | | |
| | Chemicals & Fertilizer | 6,400 | 6,400 | 6,400 | 6,400 | 18,000 | 18,000 | 18,000 | 18,000 | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 |
| | Fuel, Oil & Nat. Gas | 1,090 | 1,030 | 1,030 | 1,090 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,090 |
| | Misc Production costs | | | | | | | | | | | | | | | | |
| | Property Taxes - Current | | | | | | | | | | | | | | | | |
| | Utilities | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 3,000 | 3,000 |
| | Repairs & Maintenance | | 25,000 | 25,000 | | | | | | | | | | | | | |
| | Misc. Maint. Supplies | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 |
| | Shipping & Handling | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| | Wine Processing and Bottling | 15,250 | 2,200 | 7,000 | | | | 10,000 | 10,000 | 10,000 | | 50,000 | 50,000 | 100,000 | 100,000 | 100,000 | 100,000 |
| | Payroll | 15,250 | | 75,250 | 85,250 | | | 123,250 | | 131,000 | | 110,000 | 110,000 | 112,000 | | 75,000 | |
| | Payroll tax ER portion | 1,678 | 8,278 | 8,278 | 9,378 | 9,378 | 13,558 | 13,558 | | 14,430 | | 12,100 | 12,100 | 12,100 | | 8,250 | |
| | Sales & Marketing Expense | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 |
| | Admin Expenses | 2,896 | 2,896 | | | | 2,896 | | 2,896 | | 2,896 | | | | | 2,896 | |
| | Insurance | | | | 9,910 | | | | | 9,910 | | | | | | | |
| | Equipment Leases | 2,730 | 2,730 | 5,000 | 7,000 | 7,200 | 2,730 | 5,000 | 7,000 | 7,200 | 7,200 | 2,730 | | 7,000 | 7,200 | 2,730 | |
| | Contingency | 1,560 | 4,805 | 5,230 | 25,250 | 6,985 | 1,515 | 8,834 | 3,093 | 10,994 | 9,375 | 9,175 | 7,933 | 8,884 | 8,263 | 6,327 | 2,293 |
| | **Total Disbursements** | 32,756 | 100,698 | 190,046 | 215,437 | 134,981 | 32,018 | 185,510 | 64,562 | 340,883 | 75,342 | 192,673 | 62,402 | 166,562 | 48,362 | 132,871 | 39,552 |
| | | | | | | | | | | | | | | | | | |
| | Cash Flow from Operations | 97,244 | (36,898) | (125,966) | (151,437) | (64,081) | 23,982 | (130,510) | (12,942) | (179,883) | 15,658 | (98,673) | 28,598 | (15,562) | 137,838 | 53,129 | 146,448 |
| | Accumulated Cash Flow | 97,244 | 60,346 | (65,640) | (217,077) | (281,157) | (256,176) | (386,685) | (399,627) | (578,509) | (562,872) | (661,345) | (632,547) | (647,609) | (328,070) | (476,541) | (330,093) |
| | Lowest Amount Cash Value | | | | | | | | | | | | | | | | |

(602,509)   22-Aug-11

Disclaimer: This presentation estimates performance of the Company based on historical data, estimates, and assumptions. It cannot be relied upon to reflect actual results.

CONFIDENTIAL
Page 2 of 4
6/14/2011 5:46 PM

**Weekly Budget for Olsen Agriculture LLC**

| | Week beginning | 1 30-May-11 | 2 6-Jun-11 | 3 13-Jun-11 | 4 20-Jun-11 | 5 27-Jun-11 | 6 4-Jul-11 | 7 11-Jul-11 | 8 18-Jul-11 | 9 25-Jul-11 | 10 1-Aug-11 | 11 8-Aug-11 | 12 15-Aug-11 | 13 22-Aug-11 | 14 29-Aug-11 | 15 5-Sep-11 | 16 12-Sep-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Non-Operating Items** | | | | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | | | | |
| DIP Financing | | - | - | 675,000 | - | - | - | - | 2,325,000 | - | - | - | - | - | - | - | - |
| Equipment Sales | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Land Sales | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Receipts | | - | - | 675,000 | - | - | - | - | 2,325,000 | - | - | - | - | - | - | - | - |
| **Disbursements** | | | | | | | | | | | | | | | | | |
| Rabo Note | 6.50% | | | | | | | | | | | | | | | | |
| Rabo Line of Credit | 6.0% | | | | | | | | | | | | | | | | |
| DIP Loan Fees | | 30,000 | | | | | | | | | | | | | | | |
| DIP Loan Expense | 12% | | | 27,000 | | | | | | | | 30,000 | | | | | 30,000 |
| DIP Loan Interest Expense | | | | 30,000 | | | | 6,750 | | | | | | | | | |
| IRS Secured Claim | | | | | | | | | 125,000 | | | | | | | | |
| Land Lease Cure Payments | | | | | 22,200 | | | | | | | | | | | | |
| Utility Deposits | | 15,000 | | | | | | | | | | | | | | | |
| Professional Fees: | | | | | | | | | | | | | | | | | |
| Appraisals | | | | | | | | | | | | | | | | | |
| Hamstreet | | | | | | | | | 50,000 | | 15,000 | | | | 120,000 | | |
| Greene & Markley | | | | | | | | | 160,000 | | | | | | 125,000 | | |
| Tax Accountants | | | | | | | | | 175,000 | | | | | | 25,000 | | |
| Committee Counsel | | | | | | | | | | | | | | | | | |
| UST Fees | | | | | | | | 6,750 | | 4,875 | | | | | | | |
| Total Disbursements | | 45,000 | - | 57,000 | 22,200 | - | - | 6,750 | 533,500 | 4,875 | 15,000 | 30,000 | - | - | 270,000 | - | 30,000 |
| | | | | | | | | | | | | | | | | | |
| Total Non-Operating Cash Flow | | (45,000) | - | 618,000 | (22,200) | | | (6,750) | | (4,875) | (15,000) | (30,000) | | | (270,000) | | (30,000) |
| Accumulated Cash Flow | | (45,000) | | 573,000 | 550,800 | 500,800 | 550,800 | 544,050 | 2,316,050 | 2,311,175 | 2,296,175 | 2,266,175 | 2,266,175 | 2,266,175 | 1,996,175 | 1,996,175 | 1,966,175 |
| Lowest Accum Cash Value | | (45,000) | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | | 43,442 | 95,686 | 58,788 | 638,000 | 550,802 | 377,165 | 388,066 | 200,807 | 1,959,845 | 1,776,045 | 1,776,087 | 1,648,272 | 1,648,272 | 1,662,208 | 1,670,947 | 1,563,076 |
| Cash Flow - Operating | | 97,234 | (36,898) | (125,986) | 38,788 | (155,437) | (155,518) | (133,509) | (123,962) | (139,863) | 15,858 | (908,675) | 29,398 | 13,935 | 117,838 | 53,129 | 146,546 |
| Cash Flow - Non-Operating | | (85,000) | | 638,000 | (22,200) | | | (6,750) | 1,272,000 | (4,875) | (15,000) | (30,000) | | (35,562) | (270,000) | | (90,000) |
| Ending Cash Balance | | 55,686 | 58,788 | 638,000 | 550,802 | 377,165 | 388,066 | 200,807 | 1,959,845 | 1,776,087 | 1,776,087 | 1,648,272 | 1,677,670 | 1,662,208 | 1,670,947 | 1,563,076 | 1,476,554 |
| Lowest Accum Cash Value | | | | | | | | | | | | | | | | | 1,476,554 |

CONFIDENTIAL
Page 3 of 4
6/14/2011 5:46 PM

# Weekly Budget for Orrin Agriculture LLC

| | Week beginning | 17 25-Sep-11 | 18 2-Oct-11 | 19 9-Oct-11 | 20 16-Oct-11 | 21 23-Oct-11 | 22 30-Oct-11 | 23 6-Nov-11 | 24 13-Nov-11 | 25 20-Nov-11 | 26 27-Nov-11 | 27 4-Dec-11 | 28 11-Dec-11 | 29 18-Dec-11 | 30 25-Dec-11 | 31 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts:** | | | | | | | | | | | | | | | | | |
| 200 | Seed | 68,000 | 68,000 | 68,000 | 68,000 | 68,000 | 68,000 | 68,000 | 68,000 | 68,000 | 68,000 | 68,000 | 20,000 | 20,000 | 20,000 | 20,000 | 1,192,000 |
| 400 | Mint (wet) | 175,000 | | | 1,000,000 | | | | | | | | | | | | 1,520,000 |
| 500 | Row Crops | | | | | | | | 450,000 | | 75,000 | | | | | | 375,000 |
| 600 | Fruit (Blueberry) | 6,000 | 2,000 | 2,000 | 2,000 | 1,000 | | 1,000 | | | | | | | 34,000 | 34,000 | 435,400 |
| 700 | Nut | 9,000 | 5,000 | 5,000 | 35,000 | 80,000 | 80,000 | 79,000 | 79,000 | 75,000 | 75,000 | 30,000 | 80,000 | 20,000 | 20,000 | 20,000 | 77,000 |
| 800 | Wine & Grapes | | | 35,000 | 35,000 | | | | | | | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 40,000 |
| 900 | Rent | | | | 3,000 | | | 3,000 | | | | | 3,000 | | | | 990,000 |
| | **Total Receipts** | 258,000 | 75,000 | 115,000 | 1,108,000 | 149,000 | 148,000 | 150,000 | 150,000 | 143,000 | 143,000 | 98,000 | 50,000 | 104,000 | 104,000 | 104,000 | 4,467,000 |
| | | | | | | | | | | | | | | | | | |
| **Disbursements** | | | | | | | | | | | | | | | | | |
| | Brokerage Fees | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 300 | 300 | 300 | 300 | 26,040 |
| | Rent (Land Leases) | | | | | | | | 450,000 | | | | | | | | 450,000 |
| | Chemicals & Fertilizer | 20,500 | 20,500 | 20,500 | 20,500 | 20,500 | | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 4,000 | 4,000 | 4,000 | 375,000 |
| | Fuel, Oil & Nat. Gas | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 1,030 | 435,400 |
| | Mint Production costs | | | | | | | | | | | | | | | | 41,924 |
| | Property Taxes - Current | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 83,000 |
| | Utilities | | | | | | | | | | | | | | | | |
| | Repairs & Maintenance | 330 | 330 | 330 | 330 | 330 | 380 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 330 | 50,000 |
| | Misc. Maint. Supplies | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 50,230 |
| | Shipping & Handling | | | 25,000 | 25,000 | 25,000 | 75,000 | 25,000 | | | | | | | | | 31,000 |
| | Wine Processing and Bottling | 75,000 | | 70,000 | 70,000 | 100,000 | | 100,000 | | 60,000 | | 60,000 | 55,000 | 55,000 | 55,000 | 55,000 | 280,500 |
| | Payroll | 8,250 | | 7,200 | 7,200 | 11,000 | | 11,000 | | 6,600 | 6,600 | 6,600 | 6,250 | 6,050 | 6,050 | 6,050 | 1,300,000 |
| | Payroll tax till portion | | | | | | | | | | | | | | | | 243,000 |
| | Sales & Marketing Expense | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 788 | 24,442 |
| | Admin Expenses | | | 2,896 | | | | | 2,896 | | | | 2,896 | | | | 25,269 |
| | Insurance | 9,910 | | | | | | 9,910 | | | 9,910 | | | 9,910 | | 9,910 | 60,670 |
| | Equipment Leases | 7,000 | 7,200 | 2,730 | 7,000 | 7,200 | 9,510 | 2,730 | 2,730 | 7,200 | 7,200 | 7,200 | 2,730 | 7,200 | 7,200 | 7,200 | 114,510 |
| | Contingency | 6,291 | 1,163 | 6,800 | 2,833 | 8,533 | 3,614 | 3,614 | 25,840 | 9,938 | 1,156 | 4,298 | 854 | 3,500 | 3,500 | 4,355 | 172,079 |
| | **Total Disbursements** | 134,220 | 36,612 | 142,793 | 55,932 | 179,202 | 71,802 | 153,577 | 542,633 | 82,207 | 73,182 | 90,267 | 17,517 | 73,498 | 73,498 | 91,464 | 3,632,564 |
| | | | | | | | | | | | | | | | | | |
| | Cash Flow from Operations | 123,780 | 38,388 | (37,793) | 1,052,098 | (30,202) | 77,808 | (3,577) | (392,633) | 60,293 | 69,818 | 7,733 | 32,571 | 94,504 | 13,536 | | 834,436 |
| | Accumulated Cash Flow | (206,318) | (167,924) | (205,718) | 846,380 | 816,779 | 894,687 | 865,510 | 493,876 | 554,170 | 673,988 | 681,721 | 713,783 | 823,950 | 834,436 | | |
| | Lowest Amount Cash Value | (627,509) | 22-Aug-11 | | | | | | | | | | | | | | |

Disclaimer: This presentation estimates performance of the Company based on historical data, estimates, and assumptions. It cannot be relied upon to reflect actual results.

CONFIDENTIAL
Page 4 of 4
6/14/2011 5:46 PM

**Weekly Budget for Oben Agriculture LLC**

| | | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week beginning | | 19-Sep-11 | 26-Sep-11 | 3-Oct-11 | 10-Oct-11 | 17-Oct-11 | 24-Oct-11 | 31-Oct-11 | 7-Nov-11 | 14-Nov-11 | 21-Nov-11 | 28-Nov-11 | 5-Dec-11 | 12-Dec-11 | 19-Dec-11 | 26-Dec-11 | |
| **Non-Operating Items** | | | | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | | | | |
| DIP Financing | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 3,000,000 |
| Equipment Sales | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Land Sales | | - | - | - | - | - | - | 1,000,000 | - | - | - | - | - | - | - | - | 1,000,000 |
| **Total Receipts** | | - | - | - | - | - | - | 1,000,000 | - | - | - | - | - | - | - | - | 4,000,000 |
| **Disbursements** | | | | | | | | | | | | | | | | | |
| Wages | | - | - | - | - | - | - | 84,281 | - | - | - | 84,281 | - | - | - | 84,281 | 252,842 |
| Rabo line of Credit | 6.5% | - | - | - | - | - | - | 94,927 | - | - | - | 94,927 | - | - | - | 94,927 | 284,780 |
| DIP Loan Fees | 8.0% | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 120,000 |
| DIP Loan Expense | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 60,000 |
| DIP Loan Interest Expense | 12% | - | - | - | 30,000 | - | - | - | 30,000 | - | - | - | - | 30,000 | - | - | 146,250 |
| IRS Secured Claim | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 125,000 |
| Land Lease Cure Payments | | - | - | - | - | - | - | - | - | - | - | - | 300,000 | - | - | - | 300,000 |
| Utility Deposits | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 37,200 |
| **Professional Fees** | | | | | | | | | | | | | | | | | |
| Appraisals | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 65,000 |
| Hamstreet | | - | - | 100,000 | - | - | - | - | 125,000 | - | - | - | - | - | - | 140,000 | 420,000 |
| Greene & Markley | | - | - | 125,000 | - | - | - | - | 125,000 | - | - | - | - | - | - | 125,000 | 625,000 |
| Tax Accountants | | - | - | 25,000 | - | - | - | - | - | - | - | - | - | - | - | - | 50,000 |
| Committee Counsel | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| UST Fees | | - | - | - | - | - | 6,500 | - | - | - | - | - | - | - | - | - | 13,375 |
| **Total Disbursements** | | - | - | 250,000 | 30,000 | - | 6,500 | 179,207 | 255,000 | - | - | 179,207 | 300,000 | 30,000 | - | 444,207 | 2,707,047 |
| **Total Non-Operating Cash Flow** | | - | - | (250,000) | (30,000) | - | (6,500) | 820,793 | (255,000) | - | - | (179,207) | (300,000) | (30,000) | - | (444,207) | 1,292,053 |
| Accumulated Cash Flow | | 1,956,175 | 1,956,175 | 1,716,175 | 1,686,175 | 1,686,175 | 1,679,675 | 2,500,468 | 2,245,468 | 2,245,468 | 2,245,468 | 2,066,260 | 1,766,260 | 1,736,260 | 1,736,260 | 1,292,053 | 1,292,053 |
| Lowest Account Cash Value | 30-May-11 | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | (40,000) | 1,679,524 | 1,803,304 | 1,841,639 | 1,533,899 | 2,576,597 | 2,546,396 | 2,617,204 | 3,430,420 | 2,782,786 | 2,843,080 | 2,962,897 | 2,791,423 | 2,523,696 | 2,505,998 | 2,601,602 | |
| Cash Flow - Operations | | 123,780 | 38,388 | (57,796) | (52,698) | 72,108 | 70,808 | (7,677) | (392,634) | 60,293 | 178,816 | 7,733 | 52,273 | 13,502 | 94,604 | 123,556 | 43,440 |
| Cash Flow - Non Operating | | | | (250,000) | (30,000) | | (6,500) | 820,793 | (255,000) | | | (179,207) | (300,000) | (30,000) | | (444,207) | 814,416 |
| Ending Cash Balance | 58,388 | 1,803,304 | 1,841,639 | 1,533,899 | 2,576,597 | 2,546,396 | 2,617,204 | 2,782,786 | 2,843,080 | 2,962,897 | 2,791,423 | 2,523,696 | 2,505,998 | 2,601,602 | 2,601,602 | 2,180,931 | 1,292,053 |
| Lowest Account Cash Value | 6-Jun-11 | 1,803,304 | 1,841,639 | 1,533,899 | 2,576,597 | 2,546,396 | 2,617,204 | 2,782,786 | 2,843,080 | 2,962,897 | 2,791,423 | 2,523,696 | 2,505,998 | 2,601,602 | 2,601,602 | 2,180,931 | 2,180,931 |

Disclaimer: This presentation estimates performance of the Company based on historical data, estimates, and assumptions. It cannot be relied upon to reflect actual results.